1  BENJAMIN J. FOX (SBN 193374)
2  MATTHEW J. WYATT (SBN 343074)
   REGINA M. CAMPBELL (SBN 355919)
3  MORRISON & FOERSTER LLP
   707 Wilshire Boulevard, Suite 6000
4  Los Angeles, CA 90017-3543
   Telephone: 213.892.5200
5  Facsimile: 213.892.5454
   bfox@mofo.com; mwyatt@mofo.com
6  rcampbell@mofo.com

7  Attorneys for Defendants
   TOP INNOVATIONS LLC and
8  TOP INNOVATIONS US, LLC

9  (*Additional Party and Counsel Appear at Signature Blocks*)

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13  NEW LEAF PUBLISHING, INC.,          Case No. 2:24-cv-4676-MEMF-SSCx

14            Plaintiff,                **JOINT MEMORANDUM OF POINTS AND AUTHORITIES RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

15       v.

16  TOP INNOVATIONS LLC;
    TOP INNOVATIONS US, LLC,           Date:        September 11, 2025
17                                     Time:        10:00 a.m.
            Defendants.                Dept.:       Courtroom 8B
18

19                                     Action Filed:   June 4, 2024
20                                     SAC Filed:      February 21, 2025

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

I.  INTRODUCTION (DEFENDANTS' OPENING STATEMENT)................1

II.  INTRODUCTION (PLAINTIFF'S OPPOSITION) .......................................1

III.  INTRODUCTION (DEFENDANTS' REPLY)..........................................3

IV.  UNDISPUTED FACTS (DEFENDANTS' OPENING STATEMENT) ........4

    A.  The Six Films at Issue Are Based Entirely on Six Underlying Scripts Written by Abby Dzeng and Mibao Xiong ..............................4

    B.  Ms. Dzeng and Ms. Xiong Were Employed by Crazy Maple Studio ........................................................................................4

    C.  Under Ms. Dzeng's and Ms. Xiong's Employment Agreements, Crazy Maple Studio Owned all Rights to the Underlying Scripts.........5

    D.  Kayla McGinnis, Who Edited One Script, Was Also Employed by Crazy Maple Studio ..................................................................6

    E.  Plaintiff NLP Sought Copyright Registration for the Films at Issue Without a License, Assignment, or Other Transfer of Rights to the Six Underlying Scripts from Crazy Maple Studio ..........7

V.  UNDISPUTED FACTS (PLAINTIFF'S OPPOSITION)...........................7

    A.  Mibao (Sophie) Xiong and Abby (Yuki) Dzeng, the Writers of the Underlying Scripts, Have Been Employed by NLP Since 2022......................................................................................7

    B.  Ms. Dzeng and Ms. Xiong Wrote and Edited the Underlying Scripts For For NLP, Within the Scope of Their Employment by NLP, for Filming by NLP ....................................................8

    C.  NLP Owns the Copyrights to the Underlying Scripts Because They Were Works Made for Hire for NLP..............................................9

    D.  NLP is CMS's Designee Under Ms. Dzeng's and Ms. Xiong's Employee Obligations Agreements for Purposes of the Underlying Scripts .................................................................10

    E.  CMS Impliedly Licensed and Orally Ratified NLP's Creation of the Films at Issue ........................................................................11

VI.  UNDISPUTED FACTS (DEFENDANTS'  REPLY) .................................12

VII.  LEGAL STANDARD (MOVANTS' STATEMENT) ...............................13

VIII.  LEGAL STANDARD (PLAINTIFF'S OPPOSITION) ............................14

i

IX.   ARGUMENT (DEFENDANTS' MOVING STATEMENT) ....................... 14

   A.   Summary Judgment Should Be Granted Because NLP Does Not Own a Valid Copyright to the Films at Issue ................................ 14

   B.   NLP Cannot Revive Its Copyright Infringement Claim by Retroactively Acquiring Rights to the Films at Issue .......................... 17

X.   ARGUMENT (PLAINTIFF'S OPPOSITION) ............................................... 18

   A.   The Underlying Scripts Were Works for Hire for NLP ..................... 18

   B.   Ms. Dzeng's and Ms. Xiong's Employment Agreements Cannot Alter the Underlying Scripts' Status as a Work Made for Hire for NLP, Not CMS ................................................................................... 21

   C.   Even if the Underlying Scripts Were Works for Hire for CMS, or Otherwise Owned by CMS, NLP is CMS's Designee Under Ms. Dzeng's and Ms. Xiong's Employment Agreements ................. 22

   D.   Even if the Underlying Scripts Were Works for Hire for CMS, or Otherwise Owned by CMS, CMS Impliedly Licensed and Ratified NLP's Creation of the Films at Issue ..................................... 23

XI.   ARGUMENT (DEFENDANTS' REPLY) ...................................................... 25

   A.   NLP Does Not Raise a Triable Issue on Its Lack of a Valid Copyright to the Films at Issue .......................................................... 25

      1.   NLP cannot avoid that the Underlying Scripts were works-for-hire for Crazy Maple Studio—not NLP ................. 26

      2.   NLP cannot show that Crazy Maple Studio gave it copyrights to the Underlying Scripts, whether by designation, implied license, or ratification .............................. 31

   B.   NLP's Failure to Own Rights to the Films at Issue When It Registered Them and Brought This Action Is Fatal to Its Claim ........ 33

XII.   CONCLUSION (MOVANTS' STATEMENT) ............................................. 33

XIII.   CONCLUSION (PLAINTIFF'S OPPOSITION) ......................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................. 13, 14

*Anderson v. Stallone,*
No. 87-0592 WDKGX, 1989 WL 206431
(C.D. Cal. Apr. 25, 1989) ........................................................................ 15

*Asset Mktg. Sys., Inc. v. Gagnon,*
542 F.3d 748 (9th Cir. 2008) .................................................................... 23

*Call Delivery Sys., LLC v. Morgan,*
No. 2:20-cv-04637-CBM-(PDx), 2022 WL 3574433
(C.D. Cal. Mar. 16, 2022) .................................................................... 26, 32

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................. 14

*Chevron Corp. v. Pennzoil Co.,*
974 F.2d 1156 (9th Cir. 1992) .................................................................. 14

*Chromologic LLC v. Yang,*
No. SACV 13-01575 JVS (CWx), 2013 WL 12125537
(C.D. Cal. May 9, 2013) ........................................................................... 22

*Cmty. for Creative Non-Violence v. Reid,*
490 U.S. 730 (1989) ........................................................................... 18, 28

*Davis v. Blige,*
505 F.3d 90 (2d Cir. 2007) ....................................................................... 32

*DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC,*
870 F.3d 978 (9th Cir. 2017) .................................................................... 31

*Eden Toys, Inc. v. Florelee Undergarment Co.,*
697 F.2d 27 (2d Cir. 1982) .................................................................. 16, 24

*Effects Assocs. v. Cohen,*
908 F.2d 555 (9th Cir. 1990) .................................................................... 23

*Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*,
      122 F.3d 1211 (9th Cir. 1997)...........................................................................15

*Foad Consulting Grp., Inc. v. Azzalino*,
      270 F.3d 821 (9th Cir. 2001)............................................................................23

*Fontana v. Harra*,
      No. CV 12-10708 CAS, 2013 WL 990014
      (C.D. Cal. Mar. 12, 2013)..........................................................................23, 24

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
      586 U.S. 296 (2019) ..................................................................................17, 19

*Hiller, LLC v. Success Grp. Int'l Learning All., LLC*,
      976 F.3d 620 (6th Cir. 2020)............................................................................16

*Idearc Media Corp. v. Nw. Directories, Inc.*,
      623 F. Supp. 2d 1223 (D. Or. 2008)............................................................21, 29

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.*,
      957 F.3d 1038 (9th Cir. 2020)..........................................................................23

*J2F Prods. Inc. v. Sarrow*,
      No. CV09-7000-JST, 2010 WL 11515282
      (C.D. Cal. Nov. 16, 2010) ...............................................................................27

*Jitrade Inc. v. Charlotte Russe, Inc.*,
      No. CV 16-5536-DMG (JCX), 2018 WL 2718049
      (C.D. Cal. Jan. 4, 2018)............................................................................20, 29

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*,
      617 F.3d 1146 (9th Cir. 2010)......................................................................19, 30

*JustMed, Inc. v. Byce*,
      600 F.3d 1118 (9th Cir. 2010)......................................................................21, 28

*Kodadek v. MTV Networks, Inc.*,
      152 F.3d 1209 (9th Cir. 1998)..........................................................................17

*Maurey v. Univ. of S. Cal.*,
      87 F. Supp. 2d 1021 (C.D. Cal. 1999),
      *aff'd by* 12 F. App'x 529 (9th Cir. 2001) ..........................................................26

*Nat'l Ass'n of Optometrists & Opticians v. Harris,*
    682 F.3d 1144 (9th Cir. 2012) ............................................................ 14

*Nirvana L.L.C. v. Marc Jacobs Int'l L.L.C.,*
    No. LA CV18-10743 JAK (SK), 2023 WL 11821416
    (C.D. Cal. Dec. 21, 2023) ....................................................... 19, 28

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.,*
    210 F.3d 1099 (9th Cir. 2000) ............................................................ 14

*Pickett v. Prince,*
    207 F.3d 402 (7th Cir. 2000) ............................................................ 16

*Polychron v. Bezos,*
    No. 2:23-CV-02831-SVW, 2023 WL 6192743
    (C.D. Cal. Aug. 14, 2023) ............................................................ 15

*Pryor v. Jean,*
    No. CV 13-02867-DDP, 2013 WL 12129950
    (C.D. Cal. Oct. 28, 2013) ............................................................ 18

*SHL Imaging, Inc. v. Artisan House, Inc.,*
    117 F.Supp.2d 301 (S.D.N.Y. 2000) ............................................................ 24

*Siniouguine v. Mediachase Ltd.,*
    No. CV 11-6113-JFW, 2012 WL 2317364
    (C.D. Cal. June 11, 2012) ....................................................... 21, 29

*Sobhani v. @Radical.Media Inc.,*
    257 F. Supp. 2d 1234 (C.D. Cal. 2003) ....................................................... 1, 15

*Soremekun v. Thrifty Payless, Inc.,*
    509 F.3d 978 (9th Cir. 2007) ............................................................ 14

*Swift Harvest USA, LLC v. Boley Int'l HK Ltd.,*
    No. ED CV 19-1700-DMG, 2020 WL 7380148
    (C.D. Cal. Sept. 22, 2020) ............................................................ 18

*TD Bank N.A. v. Hill,*
    928 F.3d 259 (3d Cir. 2019) ............................................................ 21

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC,*
    692 F.3d 1009 (9th Cir. 2012) ....................................................... 19, 23, 30

*United States v. Diebold, Inc.*,
   369 U.S. 654 (1962) ........................................................................... 14

*Woodland v. Hill*,
   136 F.4th 1199 (9th Cir. 2025).......................................................... 14

*Yeager v. Bowlin*,
   693 F.3d 1076 (9th Cir. 2012).......................................... 25, 26, 27, 32

**Statutes, Rules, and Other Authorities**

17 U.S.C. § 101.........................................................................15, 17, 18, 28

17 U.S.C. § 103(a) ........................................................................... 15

17 U.S.C. § 106(2).........................................................................1, 15

17 U.S.C. § 201(b)..................................................................... 18, 28

17 U.S.C. § 408(a) ........................................................................... 18

Fed. R. Civ. P. 56(a) ................................................................ 13, 14

Cal. Civ. Code § 1641 ..................................................................... 23

Goldstein on Copyright § 4.3 (3d ed. 2018)............................... 22

1 Nimmer on Copyright § 3.06 (2025)...............................15, 17

1 Nimmer on Copyright § 5.03 (2025)....................................... 22

3 Nimmer on Copyright § 10.03 (2025).................................18, 28

## I. INTRODUCTION (DEFENDANTS' OPENING STATEMENT)

The sole remaining claim for relief in the Second Amended Complaint is for copyright infringement of six short films allegedly owned by plaintiff New Leaf Publishing, Inc. ("NLP"). NLP has aggressively pursued this litigation to harm a competitor (together, "Defendants" or "Top Innovations"), even though Top Innovations licensed its films from a third party *and* removed them from their app weeks after launch, upon receiving notice of NLP's claims. NLP's litigation tactics have included multiple repleading attempts to expand (and then abandon) the scope of its case, and demanding depositions overseas even after the parties stipulated to virtually all the relevant facts. (ECF Nos. 1, 21, 39, 43, 46.) Now, after all that effort, Top Innovations moves for summary judgment because the undisputed facts show that NLP does not own copyrights to the films at issue. According to NLP's own documents and witnesses, the films were based directly on six screenplay scripts, which were written for and owned by a non-party, Crazy Maple Studio.

NLP and Crazy Maple Studio claim to be related or affiliated companies, but Crazy Maple Studio did not convey rights in the scripts to NLP. The scriptwriters worked for Crazy Maple Studio under employment contracts that made clear that their work was for Crazy Maple Studio, not NLP. No agreement between the companies gave NLP the right to make films from the scripts. Because the owner of an underlying copyrighted work (here, Crazy Maple Studio, for its scripts) "has the exclusive rights . . . to prepare derivative works," 17 U.S.C. § 106(2), the films are not owned or copyrighted by NLP. The scripts "*pervade* the entire derivative work" so NLP does not have a valid copyright in its versions of the films. *Sobhani v. @Radical.Media Inc.*, 257 F. Supp. 2d 1234, 1240 (C.D. Cal. 2003).

For the reasons discussed herein, summary judgment on the Second Amended Complaint should be granted in Top Innovations' favor.

## II. INTRODUCTION (PLAINTIFF'S OPPOSITION)

Defendants Top Innovations LLC and Top Innovations US, LLC (collectively,

1

"Defendants") do not contest that they infringed the copyrights to the six films at issue. ECF 46 at 3. The sole basis for Defendants' motion for summary judgment is that Plaintiff New Leaf Publishing, Inc. ("NLP") allegedly does not own the copyrights to the films because the underlying screenplay scripts ("scripts" or "Underlying Scripts") allegedly were written for and owned by Crazy Maple Studio ("CMS").[1] Remarkably, Defendants fail to mention that CMS is NLP's parent company and sole owner, and that CMS, NLP, and the two script writers, Mibao (Sophie) Xiong and Abby (Yuki) Dzeng all agree that the scripts were written and edited *for NLP*, within the scope of the writers' employment *by NLP*, for filming *by NLP*, and are works-for-hire *for NLP*. CMS, NLP, Ms. Xiong, and Ms. Dzeng always understood and agreed that the scripts belong to NLP and that NLP owns the copyrights to the scripts. These facts are fatal to Defendants' motion because, as the owner of the Underlying Scripts, NLP is also the rightful owner of the copyrights to the films at issue.

Defendants rely heavily on the writers' employment contracts with CMS to argue that the Underlying Scripts were works-for-hire for CMS. But the scripts were written and edited within the writers' scope of employment for NLP, not CMS, and thus were not works-for-hire for CMS. Parties cannot by contract alter a work's status as a work made for hire under Section 101 of the 1976 Copyright Act. Moreover, even if the scripts were works-for-hire for CMS, CMS impliedly licensed NLP to create the films at issue and ratified NLP's creation of those films.

Because it is undisputed that NLP was authorized to create the films at issue from the Underlying Scripts, either as the owner of the scripts or with CMS's implied license and ratification, NLP owns the copyrights to the films at issue. For these reasons, which are explained below, the Court should deny Defendants' motion for summary judgment and make a finding of fact that NLP is the valid owner of the works at issue and the copyrights thereto.

---

[1] Defendants do not dispute that NLP created the six films at issue.

### III.    INTRODUCTION (DEFENDANTS' REPLY)

NLP's opposition relies entirely on "sham declarations" that are inadmissible because they directly conflict the deposition testimony of NLP's Rule 30(b)(6) designee, Yitao Zhao.  Mr. Zhao testified that the scriptwriters who created the scripts underlying the films at issue were hired, paid, and employed by Crazy Maple Studio.  He testified that the scriptwriters had no employment agreements with NLP of any kind.  Now, in opposition, NLP submits declarations from Mr. Zhao and others that contradict NLP's prior sworn statements.  Incredibly, they now claim that the scriptwriters were employed by NLP and wrote the scripts within the scope of employment by NLP.  These declarations are shams—submitted improperly to thwart summary judgment and further prolong this litigation.  Given the prior testimony, they fail to create a genuine factual dispute as to the scriptwriters' employment by Crazy Maple Studio (and thus Crazy Maple Studio's ownership of the copyrights) and must be disregarded.

NLP's related contention that Crazy Maple Studio agreed to "give" NLP rights to the scripts in various ways is also untethered to factual support.  Mr. Zhao testified that NLP had not been given *any* license to the underlying scripts.  He also denied *any* intellectual property agreement between NLP and Crazy Maple Studio, either "written" or "unwritten."  NLP attempts to skirt these sworn statements, arguing that Mr. Zhao was not asked specifically about an "implied license."  But the testimony is clear and unequivocal: Crazy Maple Studio did not grant NLP rights to the underlying scripts in any way.  Again, NLP's sham declaration claiming the opposite must be rejected as a matter of law.

There is no genuine dispute of fact that ownership to the underlying scripts resides with Crazy Maple Studio, and Crazy Maple Studio did not grant NLP a right to use to scripts to create the film at issue.  Without a valid, timely assignment of copyrights to the films, NLP has no standing to sue.  Accordingly, summary judgment in Top Innovations' favor should be granted.

3

## IV.    UNDISPUTED FACTS (DEFENDANTS' OPENING STATEMENT)

### A.    The Six Films at Issue Are Based Entirely on Six Underlying Scripts Written by Abby Dzeng and Mibao Xiong

The six films (the "Films at Issue") are based entirely on six corresponding screenplay scripts (the "Underlying Scripts"), as shown in the table below:

| Film at Issue | Underlying Script |
|---|---|
| Fatal Temptation: Between Two Alphas | Between Two Alphas |
| Fated to My Forbidden Alpha | Fated to My Forbidden Alpha |
| Goodbye, My CEO! | Goodbye, My CEO |
| Marry Me, Mr. White | Marry Me, Mr. White |
| My Gorgeous Wife is an Ex-Convict | My Gorgeous Wife is an Ex-Convict |
| My Husband Killed Me, then I Won the Mega Ball! | My Husband Killed Me, then I Won the Mega Ball |

(Undisputed Facts ["UF"] 1-6; *see* ECF No. 39 ("SAC") ¶¶ 14, 16, 18, 20, 22, 24.)

The Underlying Scripts were written by screenwriters Mibao ("Sophie") Xiong and Abby ("Yuki") Dzeng.  (UF 8, 10, 14.)  Ms. Dzeng drafted and edited the scripts entitled "Between Two Alphas" and "Fated to My Forbidden Alpha." (UF 8.)  Ms. Xiong drafted and edited the other four scripts: "Goodbye, My CEO," "Marry Me, Mr. White," "My Gorgeous Wife is an Ex-Convict," and "My Husband Killed Me, then I Won the Mega Ball."  (UF 10.)

Ms. Xiong also directed and approved screenwriter Kayla McGinnis to revise small sections of dialog in the script "My Gorgeous Wife Is an Ex-Convict" and to edit it for grammar, typos, and formatting.  (UF 11-12.)  No one else was involved in drafting or editing the six Underlying Scripts.  (UF 9, 13.)

### B.    Ms. Dzeng and Ms. Xiong Were Employed by Crazy Maple Studio

Ms. Dzeng and Ms. Xiong were not employed by NLP.  (UF 15, 21.)  Indeed, they did not have any agreements with NLP.  (UF 16, 22.)  When they wrote the

Underlying Scripts, they each had an employment agreement with a separate entity: Crazy Maple Studio.  (UF 17, 23.)  Ms. Dzeng's employment agreement with Crazy Maple Studio, which she signed on June 16, 2022, was effective as of June 21, 2022.  (UF 18.)  Ms. Xiong's employment agreement with Crazy Maple Studio, which she signed on November 18, 2019, was effective as of that date, more than two years before NLP was formed.  (UF 24.)  Both employment contracts were entered into by Joey Jia, in his capacity as "CEO of Crazy Maple Studio, Inc." (UF 19, 25.)  Ms. Dzeng and Ms. Xiong have not had any other contracts with Crazy Maple Studio or any contracts at all with NLP.  (UF 20, 26.)

Consistent with their employment agreements, Crazy Maple Studio paid for Ms. Dzeng's and Ms. Xiong's salaries and employee benefits.  (UF 31.)  Crazy Maple Studio has also paid Ms. Xiong bonuses based on the commercial performance of films derived from screenplays she has worked on, including for the film "Fated to My Forbidden Alpha."  (UF 32.)

Ms. Dzeng's and Ms. Xiong's employment contracts with Crazy Maple Studio included an integration clause, providing that:

> This Agreement constitutes the *complete understanding between [you] and the Company* with respect to the subject matter hereof, and all prior representations or agreements regarding the subject matter of this Agreement, including without limitation intellectual property . . . have been merged into this Agreement.

(UF 39 (emphasis added).)  The agreements provide that any modifications must be in writing and signed: "No modification of this Agreement will be valid unless made in writing and signed by [you] and a duly authorized Company officer." (UF 40.)  Ms. Dzeng and Ms. Xiong have not modified their employment agreements, much less done so in writing.  (UF 41.)

### C.    Under Ms. Dzeng's and Ms. Xiong's Employment Agreements, Crazy Maple Studio Owned all Rights to the Underlying Scripts

Ms. Dzeng's and Ms. Xiong's employment agreements with Crazy Maple Studio provide that all "Inventions" they create during their employment are the

"sole property" of the "Company":

> You acknowledge, represent and agree . . . that all Inventions are the *sole property of the Company*, and that all tangible expressions of the Inventions . . . have been developed, made or invented *exclusively for the benefit of and are the sole and exclusive property of the Company* and constitute work made for hire under Section 201 of Title 17 of the United States Code (17 U.S.C. Section 201) . . . .

(UF 33 (emphasis added).)  The term "Company" means Crazy Maple Studio, Inc. (UF 35.)  The term "Inventions" means "[a]ny . . . documents, or other works of authorship (in any medium) . . . conceived, created or developed in whole or in part by [you] during the period of [your] employment by the Company."  (UF 36 (emphasis added).)  The agreements also provide that Ms. Dzeng and Ms. Xiong "convey and assign" to Crazy Maple Studio their rights to works they create:

> You *convey and assign to the Company* or its designees, *[your] entire right*, title and interest in and to all Inventions [and] works of authorship . . . which [you] may solely or jointly develop, conceive or reduce to practice, during [your] employment . . . .

(UF 34 (emphasis added).)  As a result of these provisions, Crazy Maple Studio owned the exclusive rights to the works Ms. Dzeng and Ms. Xiong created, including the Underlying Scripts.  (UF 38.)

### D. Kayla McGinnis, Who Edited One Script, Was Also Employed by Crazy Maple Studio

Ms. McGinnis, a potential joint author of one of the scripts, was employed by Crazy Maple Studio when she edited the script "My Gorgeous Wife Is an Ex-Convict."  (UF 27.)  Ms. McGinnis signed an employment agreement with Crazy Maple Studio on June 29, 2023.  (UF 28.)  She did not have any other contracts with Crazy Maple Studio or any contracts at all with NLP.  (UF 29.) Ms. McGinnis's salary and employee benefits were paid for by Crazy Maple Studio.  (UF 31.)  Like the agreements with her supervisors, Ms. McGinnis's employment contract with Crazy Maple Studio did not provide for any assignment, licensing, or other conveyance of copyrights to NLP.  (UF 30.)

**E.    Plaintiff NLP Sought Copyright Registration for the Films at Issue Without a License, Assignment, or Other Transfer of Rights to the Six Underlying Scripts from Crazy Maple Studio**

Crazy Maple Studio has not assigned, licensed, or otherwise conveyed its rights to the Underlying Scripts to NLP.  (UF 42.)  Nor has NLP received an assignment, license, or other conveyance of rights to the Underlying Scripts from anyone else.  (UF 43.)  NLP also has not entered any agreements at all concerning the Underlying Scripts with anyone, including Ms. Xiong, Ms. Dzeng, Ms. McGinnis, and Crazy Maple Studio.  (UF 44.)  NLP has not received an exclusive license with a right to sue or assignment of rights to the Films at Issue.  (UF 45.)  Yet NLP contends that it obtained copyright registrations for the Films at Issue in 2023.  (UF 7.)

**V.    UNDISPUTED FACTS (PLAINTIFF'S OPPOSITION)**

**A.    Mibao (Sophie) Xiong and Abby (Yuki) Dzeng, the Writers of the Underlying Scripts, Have Been Employed by NLP Since 2022**

NLP is a publisher of video series on its ReelShort mobile application, which provides users with a unique experience to watch video shows of their choice. ECF 39 at ¶ 1. NLP was formed in June 2022 for the purpose of having a separate entity own, and produce content for, the ReelShort app. (Undisputed Facts ("UF") 47.) NLP has always had an office in Sunnyvale, California. (UF 48.)

CMS is the parent company and sole owner of NLP. (UF 49.) As between NLP and CMS, NLP is the only company that uses screenplays and scripts to make motion pictures. (UF 73.) CMS does not use screenplays and scripts to make motion pictures. (UF 73.)

Yitao (Archer) Zhao ("Mr. Zhao") is the Head of Product Management and Operation ("PMO") for both NLP and CMS. (UF 50.) Although Mr. Zhao has never had a written employment contract with NLP, Mr. Zhao is employed by NLP and 90% of his work is for NLP. (UF 50.) As Head of PMO for NLP, Mr. Zhao is responsible for, among other things, script development, production, release

7

scheduling, and monetization for the ReelShort app. Mr. Zhao is notified whenever a script/screenplay is being developed. Mr. Zhao also is notified whenever a script/screenplay is in production to be made into a film. (UF 51.) Mr. Zhao reports to Yi (Joey) Jia ("Mr. Jia"), the CEO of both NLP and CMS. (UF 52.)

Mibao (Sophie) Xiong ("Ms. Xiong") has worked for NLP since its founding. From 2022 to early 2025, Ms. Xiong was Head of Content of the U.S. region for NLP. In early 2025, Ms. Xiong was promoted to Global Head of Content for NLP. (UF 63.) Before Ms. Xiong worked for NLP, she was a project manager for CMS. In that role, Ms. Xiong did not write any scripts or screenplays for work. (UF 64.) Ms. Xiong reports directly to Mr. Zhao and she receives performance evaluations from Mr. Zhao. (UF 72.)

Abby (Yuki) Dzeng ("Ms. Dzeng") has worked for NLP since 2022. From November 2022 to July 2023, Ms. Dzeng was narrative designer for NLP. From July 2023 to January 2025, Ms. Dzeng was Head Writer for NLP. In January 2025, Ms. Dzeng was promoted to Head of Content of the U.S. region for NLP. (UF 54.) Once Ms. Dzeng began writing scripts for NLP, she did not work on any projects for CMS. (UF 61.) Ms. Dzeng reports directly to Ms. Xiong, and she receives performance evaluations from Ms. Xiong. (UF 62.)

**B.    Ms. Dzeng and Ms. Xiong Wrote and Edited the Underlying Scripts For NLP, Within the Scope of Their Employment by NLP, for Filming by NLP**

Ms. Dzeng wrote and edited the scripts for the films "Fatal Temptation: Between Two Alphas" and "Fated to My Forbidden Alpha." (UF 53.) When Ms. Dzeng wrote and edited these scripts, she was employed by NLP as narrative designer. (UF 55.) Ms. Dzeng wrote and edited the scripts for the films "Fatal Temptation: Between Two Alphas" and "Fated to My Forbidden Alpha" for NLP, within the scope of her employment by NLP, under the supervision and control of Ms. Xiong, for filming by NLP. (UF 56.)

Ms. Xiong wrote and edited the scripts for the films "Goodbye, My CEO!,"

8

"Marry Me, Mr. White," "My Gorgeous Wife is an Ex-Convict," and "My Husband Killed Me, Then I Won the Mega Ball!" (UF 65.)[2] When Ms. Xiong wrote and edited these scripts, she was employed by NLP. (UF 66.) Ms. Xiong wrote and edited the scripts for the films "Goodbye, My CEO!," "Marry Me, Mr. White," "My Gorgeous Wife is an Ex-Convict," and "My Husband Killed Me, Then I Won the Mega Ball!" for NLP, within the scope of her employment for NLP, under Mr. Zhao's supervision and control, for filming by NLP. (UF 67.)

Ms. Dzeng and Ms. Xiong work from the office in Sunnyvale, California. (UF 76.) Ms. McGinnis worked from there as well. (UF 76.) NLP and CMS share the office suite. (UF 76.) NLP has office hours from 9:30 a.m. to 5:30 p.m. and everyone comes in and leaves around those times. (UF 78.)

CMS and NLP provide Ms. Dzeng and Ms. Xiong with office space, a laptop computer, and supplies. (UF 77.) They did the same for Ms. McGinnis. (UF 77.)

If Ms. Dzeng wants to take vacation or sick leave, she has to get Ms. Xiong's approval. (UF 79.) If Ms. Xiong wants to take vacation or sick leave, she has to notify Messrs. Zhao and Jia. (UF 80.)

**C.   NLP Owns the Copyrights to the Underlying Scripts Because They Were Works Made for Hire for NLP**

NLP owns the copyrights to the Underlying Scripts for the films "Fatal Temptation: Between Two Alphas," "Fated to My Forbidden Alpha," "Goodbye, My CEO!," "Marry Me, Mr. White," "My Gorgeous Wife is an Ex-Convict," and "My Husband Killed Me, Then I Won the Mega Ball!" (collectively, the "Films at Issue"). (UF 81-86.) They were all works-for-hire for NLP. (UF 81-86.)

It was always understood and agreed by and between CMS, NLP, Ms. Dzeng, and Ms. Xiong that the Underlying Scripts for the Films at Issue belong to

---

[2] Kayla McGinnis ("Ms. McGinnis") touched up the script for the film "My Gorgeous Wife is an Ex-Convict." (UF 74.) She was working for NLP as a screenplay writer when she did so. (UF 74.) Ms. McGinnis reported directly to Ms. Xiong, and she received performance evaluations from Ms. Xiong. (UF 75.)

NLP, and that NLP owns the copyrights to those scripts. (UF 87.)

**D.  NLP is CMS's Designee Under Ms. Dzeng's and Ms. Xiong's Employee Obligations Agreements for Purposes of the Underlying Scripts**

Contrary to Defendants' assertion, Ms. Dzeng's and Ms. Xiong's Employee Obligation Agreements are not with CMS only. Rather, they include obligations by Ms. Dzeng and Ms. Xiong to CMS and "Related Companies," including NLP. They also state that Ms. Dzeng and Ms. Xiong "convey and assign" their Inventions and works of authorship to CMS "or its designee," which is NLP for purposes of the Underlying Scripts.

Ms. Dzeng's Employee Obligations Agreement states: "This Employee Obligations Agreement (the 'Agreement'), effective as of June 21, 2022, sets forth, among other things, the undersigned employee's ('You' or 'Your' or 'Yourself') obligations with respect to the intellectual property, confidential, trade secrets, and otherwise proprietary information of CRAZY MAPLE STUDIO, INC, (the 'Company') *and the other 'Related Companies'* as defined below." (UF 57.) Ms. Dzeng's Employee Obligations Agreement defines "Related Companies" as "collectively, the Company and each business, entity or company from time to time controlling, controlled by, or under common control with, the Company, *including* without limitation Crazy Maple Services Company, *New Leaf Publishing Inc.*, and any various interest entity thereof …." (UF 58.)

Ms. Dzeng's Employee Obligations Agreement further states: "You acknowledge, represent and agree . . . that You convey and assign to the Company *or its designee*, your entire right, title and interest in and to all Inventions, works of authorship, developments, concepts, discoveries, ideas, trademarks and trade secrets, whether or not patentable or registrable under copyright or similar laws which You may solely or jointly develop, conceive or reduce to practice, during Your employment …." (UF 59.) NLP is CMS's designee under Ms. Dzeng's Employee Obligations Agreement for purposes of the scripts for the films "Fatal Temptation:

10

Between Two Alphas" and "Fated to My Forbidden Alpha." (UF 60.)

Ms. Xiong's Employee Obligations Agreement states: "This Employee Obligations Agreement (this 'Agreement'), effective as of 11/18/19, sets forth, among other things, your obligations with respect to the intellectual property and the confidential, trade secret and otherwise proprietary information of the undersigned CRAZY MAPLE STUDIO, INC, (the 'Company') ***and the other 'Related Companies'*** as defined below." (UF 68.) Ms. Xiong's Employee Obligations Agreement defines "Related Companies" as "collectively, the Company and each business, entity or company from time to time controlling, controlled by, or under common control with, the Company …." (UF 69.) As discussed above, CMS is the parent company and sole owner of NLP. (UF 49.)

Ms. Xiong's Employee Obligations Agreement further states: "You acknowledge, represent and agree . . . that you convey and assign to the Company ***or its designee***, my [sic] entire right, title and interest in and to all Inventions, works of authorship, developments, concepts, discoveries, ideas, trademarks and trade secrets, whether or not patentable or registrable under copyright or similar laws which you may solely or jointly develop, conceive or reduce to practice, during your employment …." (UF 70.) NLP is CMS's designee under Ms. Xiong's Employee Obligations Agreement for purposes of the scripts for the films "Goodbye, My CEO!," "Marry Me, Mr. White," "My Gorgeous Wife is an Ex-Convict," and "My Husband Killed Me, Then I Won the Mega Ball!" (UF 71.)

### E.   CMS Impliedly Licensed and Orally Ratified NLP's Creation of the Films at Issue

Even if the Underlying Scripts were works-for-hire for CMS, or CMS owned right, title, or interest to the Underlying Scripts because of Ms. Dzeng's and Ms. Xiong's Employee Obligations Agreements, NLP is still the owner of the copyrights to the Films at Issue because CMS (i) impliedly licensed NLP to create the Films at Issue and (ii) ratified NLP's creation of the Films at Issue. (UF 88-89.)

## VI.    UNDISPUTED FACTS (DEFENDANTS' REPLY)

Substantial portions of NLP's counter-statement of "facts" include legal conclusions, which Defendants address below in the Argument section.  In any event, there is no genuine dispute about the following:

**Employment Status**.  NLP relies exclusively on sham affidavits that directly contradict deposition testimony of its corporate representative.  NLP's Rule 30(b)(6) witness testified that the screenwriters ***never*** had employment contracts with New Leaf Publishing.  (UF 15, 21; *see also* Zhao Tr. at 101:24-102:1 ("Q: [Ms. Dzeng] didn't have any employment contract with New Leaf Publishing; correct?  A: Correct."); Zhao Tr. at 112:21-23 ("Q: She didn't – [Ms. Xiong] never had an employment contract with New Leaf Publishing; correct?  A: Not to my knowledge.").)  It is thus undisputed that the screenwriters were employed by Crazy Maple Studio, under an employment agreement with Crazy Maple Studio.  (UF 17, 23.)  Crazy Maple Studio alone compensated them for their work.  (UF 32.)  Top Innovations addresses additional legal support regarding the screenwriters' employment status in the Reply portion of the Arguments section.

Citing no evidence or authority, NLP asserts that the employment agreements "are not with [Crazy Maple Studio] only."  That interpretation of the agreements is wrong.  It is undisputed that Ms. Dzeng's and Ms. Xiong's employment agreements with Crazy Maple Studio were both executed by Joey Jia, in his capacity as "CEO of Crazy Maple Studio, Inc."—not by any representative of NLP.  (UF 19, 25.)  The first page of both agreements explicitly provides that the terms are agreed to by the screenwriters and Crazy Maple Studio—not by anyone else.  (Wyatt Decl., Ex. E, NLP_0001722-31 at NLP_0001722 (Dzeng Employment Agreement) ("You and [Crazy Maple Studio] agree as follows . . ."); Wyatt Decl., Ex. F, NLP_0001738-47 at NLP_0001738 (Xiong Employment Agreement) (same).)

**Copyright ownership**.  The screenwriters created the scripts within the scope of their employment for Crazy Maple Studio.  (UF 17, 23; *see also* Section

XI.A.1.)  The rights to those works were therefore governed by the screenwriters' employments agreements with Crazy Maple Studio.  The agreements state that the works the screenwriters create are the "sole property" of Crazy Maple Studio.  (UF 33, 35-36.)  Thus, the Underlying Scripts, which the screenwriters wrote in the course of their employment with Crazy Maple Studio, are the "sole property" of Crazy Maple Studio.  (UF 37.)  To the extent the rights to the Underlying Scripts did not vest to Crazy Maple Studio via that provision, the agreements further state that the screenwriters "convey and assign to [Crazy Maple Studio] or its designee, [their] entire right, title and interest."  (UF 34-35.)  Either way, Crazy Maple Studio—not NLP— obtained exclusive rights to the Underlying Scripts.  (UF 38.)

**No designation, implied license, or ratification**.  Contrary to deposition testimony, NLP asserts that Crazy Maple Studio agreed to (1) designate NLP as its "designee" under the employment agrees, (2) "impliedly license[] NLP to create the Films at Issue" and (3) "ratif[y] NLP's creation of the Films at Issue."  NLP's Rule 30(b)(6) representative, however, denied *any* license between Crazy Maple Studio and NLP.  (UF 43; *e.g.*, Zhao Tr. at 45:24-46:2.)  And he denied any intellectual property agreement—"written" or "unwritten"—between NLP and Crazy Maple Studio.  (UF 42; Zhao Tr. at 228:4-13.)

## VII.  LEGAL STANDARD (MOVANTS' STATEMENT)

"A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").  A defendant is also entitled to summary judgment when the plaintiff "has failed to make a sufficient showing on

an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## VIII.  LEGAL STANDARD (PLAINTIFF'S OPPOSITION)

Summary judgment should only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

## IX.   ARGUMENT (DEFENDANTS' MOVING STATEMENT)

### A.    Summary Judgment Should Be Granted Because NLP Does Not Own a Valid Copyright to the Films at Issue

To prevail on its claim for copyright infringement, NLP must prove *inter alia* that it owns a "valid copyright." *Woodland v. Hill*, 136 F.4th 1199, 1206 (9th Cir.

14

2025) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)). Although a copyright registration can be "prima facie evidence of the validity of a copyright," a defendant "can rebut this presumption of validity" by "simply offer[ing] some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement." *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997).

The validity of a copyright to a "work based upon one or more preexisting works"—*i.e.*, a derivative work—turns on the use of underlying preexisting works. 17 U.S.C. § 101. A copyright owner "has the *exclusive rights* . . . to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2) (emphasis added). When preexisting material is used to create a derivative work, copyright protection for that derivative work "does not extend to any part of the work in which [the underlying copyrighted] material has been used unlawfully." 17 U.S.C. § 103(a). In other words, "the right to make a derivative work does not authorize the maker to incorporate into it material that infringes someone else's copyright." *Sobhani*, 257 F. Supp. 2d at 1240 (quoting *Pickett v. Prince*, 207 F.3d 402, 406 (7th Cir. 2000)). As such, the effect of using a prior work without authorization is to "deny copyright to derivative works in which the pre-existing work tends to pervade the entire derivative work." 1 Nimmer on Copyright § 3.06 (2025).

Courts in this district follow the well-established rule that "no part of an infringing derivative work should be granted copyright protection." *Anderson v. Stallone*, No. 87-0592 WDKGX, 1989 WL 206431, at *6, *10-11 (C.D. Cal. Apr. 25, 1989) (granting summary judgment for defendant on copyright claim because derivative work at issue was "pervaded by" copyrighted characters used without permission); *Polychron v. Bezos*, No. 2:23-CV-02831-SVW, 2023 WL 6192743, at *8 (C.D. Cal. Aug. 14, 2023) (copyright infringement claims "fail[ed] as a matter of law" because the work at issue was "an unauthorized derivative work that is not entitled to copyright protection"); *Sobhani*, 257 F. Supp. 2d at 1240 ("Because

copyrighted work pervades the derivative work, and because Plaintiff used the previous work without authorization, no copyright protection is afforded.").

Courts in other circuits agree:

- **Second Circuit**: *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34 n.6 (2d Cir. 1982) ("[I]f Eden did not have Paddington's consent to produce a derivative work based on Paddington's copyrighted illustrations, its derivative copyrights would be invalid, since the pre-existing illustrations used without permission would 'tend[ ] to pervade the entire derivative work.'") (quoting 1 M. Nimmer, *supra*, § 3.06, at 3-21 (1978)).

- **Sixth Circuit**: *Hiller, LLC v. Success Grp. Int'l Learning All., LLC*, 976 F.3d 620, 629 (6th Cir. 2020) (affirming jury instruction that: "[A] copyright is invalid where unauthorized preexisting material pervades the entire work or [the work] is inextricably intertwined with the preexisting material.").

- **Seventh Circuit**: *Pickett v. Prince*, 207 F.3d 402, 406 (7th Cir. 2000) (affirming dismissal of copyright claim because the allegedly infringed copyright was "a copyright that [plaintiff] had no right to obtain, namely a copyright on a derivative work based on [defendant's] copyrighted symbol").

There is no question that the Underlying Scripts pervade the Films at Issue— the films are based ***entirely*** on the scripts.  (UF 1-6.)  Thus, NLP's alleged copyrights to the Films at Issue are only valid if NLP had rights to the Underlying Scripts.  It did not.

The undisputed facts show that a separate entity, Crazy Maple Studio, owns exclusive rights to the Underlying Scripts.  (UF 38.)  Ms. Dzeng and Ms. Xiong (screenwriters who wrote the Underlying Scripts) were employed by Crazy Maple Studio when they wrote the scripts.[3]  (UF 17, 23.)  Their employment agreements with Crazy Maple Studio provide that *any* "documents" or "other works of authorship" they created during their "employment by [Crazy Maple Studio]" are the "*sole property of [Crazy Maple Studio]*."  (UF 33, 35-36 (emphasis added).) The agreements also provide that Ms. Xiong and Ms. Dzeng "*convey and assign to [Crazy Maple Studio]*" their "*entire right*, title and interest" to the works they created "during [their] employment."  (UF 34-36 (emphasis added).)

---

[3] Ms. McGinnis was also employed by Crazy Maple Studio when she worked on the script "My Gorgeous Wife Is an Ex-Convict."  (UF 27.)

16

NLP cannot argue that it obtained rights to the Underlying Scripts as works for hire.  A "work made for hire" is (1) "a work prepared by an employee within the scope of his or her employment" or (2) "a work specially ordered or commissioned."  17 U.S.C. § 101.  The screenwriters who wrote the Underlying Scripts (Ms. Dzeng and Ms. Xiong) were employees of Crazy Maple Studio—not NLP.  (UF 15-17, 21-23.)  And NLP did not specially order or commission the scripts.  (UF 46.)  Accordingly, the Underlying Scripts were not made for hire by NLP.

NLP sought copyright registration for the Films at Issue without a license, assignment, or other transfer of rights to the Underlying Scripts from Crazy Maple Studio (or anyone else).  (UF 43.)  Without Crazy Maple Studio's authorization to use the Underlying Scripts in the derivative Films at Issue, NLP is not entitled to copyright protection in the Films at Issue.  1 Nimmer on Copyright § 3.06.  Its copyright infringement claim therefore fails as a matter of law.

**B.      NLP Cannot Revive Its Copyright Infringement Claim by Retroactively Acquiring Rights to the Films at Issue**

NLP cannot cure this defect through retroactive assignment for two reasons.  First, it has not produced any evidence of retroactive assignment and, in fact, denied receiving *any* assignment or licensing of rights to the Underlying Scripts or the Films at Issue through the close of discovery.  (UF 44, 46.)

Second, it did not hold valid copyright registrations for the Films at Issue—a prerequisite for this action—when it brought this action.  The Supreme Court has explained that "*[b]efore pursuing an infringement claim in court . . . a copyright claimant generally must comply with § 411(a)'s requirement that 'registration of the copyright claim has been made.'*" *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 301 (2019) (emphasis added) (quoting 17 U.S.C. § 411(a)); *see also Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1211 (9th Cir. 1998) ("Copyright registration . . . is a prerequisite to a suit based on a copyright.").

17

Only the "owner of copyright or of any exclusive right in the work" may register a copyright.  17 U.S.C. § 408(a).  Accordingly, where as here "a registering party is not the owner *at the time of registration*, the registration is invalid."  *Pryor v. Jean*, No. CV 13-02867-DDP (AJWx), 2013 WL 12129950, at *3 (C.D. Cal. Oct. 28, 2013) (emphasis added); *see also Swift Harvest USA, LLC v. Boley Int'l HK Ltd.*, No. ED CV 19-1700-DMG (GJSx), 2020 WL 7380148, at *10 (C.D. Cal. Sept. 22, 2020) (dismissing claim based on an "invalidly registered copyright" because the registrant did not hold the rights to the work on the date it filed the registration).

Again, it is beyond reasonable dispute that NLP did not own the rights to the Films at Issue in 2023 when it purported to register them.  Accordingly, the copyright registrations for those films—*i.e.*, the prerequisites for this action—were invalid from the start and remained so when NLP filed this action.

## X.    ARGUMENT (PLAINTIFF'S OPPOSITION)

### A.    The Underlying Scripts Were Works for Hire for NLP

Section 201(b) of the Copyright Act provides that "[i]n the case of a work made for hire, the employer … is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b). Pursuant to Section 101 of the Copyright Act, a "work made for hire is … (1) a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. "No written conveyance is required from an employee in order to vest copyright in the employer." 3 *Nimmer on Copyright* § 10.03 (2025).

Although the Copyright Act does not define either "employee" or "scope of employment," the Supreme Court has held that these terms "should be understood in light of the general common law of agency." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 741 (1989) ("*CCNV*"). The Ninth Circuit has adopted a three-prong test for determining when a work is made by an employee "within the scope" of employment: (a) it is of the kind the employee is employed to perform; (b) it occurs

18

substantially within the authorized time and space limits; and (c) it is actuated, at least in part, by a purpose to serve the employer. *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1015 (9th Cir. 2012). The evidence establishes that the Underlying Scripts were works-for-hire by Ms. Dzeng and Ms. Xiong for NLP. At the least, there is a genuine dispute of material fact on the issue.

*First*, CMS, NLP, Ms. Dzeng, and Ms. Xiong all agree that NLP employs Ms. Dzeng and Ms. Xiong. (UF 54, 63.) Defendants' sole basis for arguing that Ms. Dzeng and Ms. Xiong are not employed by NLP is that they do not have a written employment contract with NLP. (UF 15-16, 21-22.) But for purposes of Section 101(1) of the Copyright Act, which looks to the general common law of agency, "*[a]n individual may be employed without a written agreement*." *Nirvana L.L.C. v. Marc Jacobs Int'l L.L.C.*, No. LA CV18-10743 JAK (SK), 2023 WL 11821416, at *11 (C.D. Cal. Dec. 21, 2023) (emphasis added).

*Second*, CMS, NLP, Ms. Dzeng, and Ms. Xiong all agree that Ms. Dzeng and Ms. Xiong wrote and edited the Underlying Scripts while employed by NLP. (UF 55, 66.)

*Third*, CMS, NLP, Ms. Dzeng, and Ms. Xiong all agree that Ms. Dzeng and Ms. Xiong wrote and edited the Underlying Scripts for NLP, within the scope of their employment for NLP, under the supervision and control of an NLP employee, for filming by NLP. (UF 56, 67.)

*Fourth*, CMS, NLP, Ms. Dzeng, and Ms. Xiong all agree that NLP owns the copyrights to the Underlying Scripts and that they were works-for-hire for NLP. (UF 81-86.) Indeed, it was always understood and agreed by and between CMS, NLP, Ms. Dzeng, and Ms. Xiong that the Underlying Scripts belong to NLP and that NLP owns the copyrights to those scripts. (UF 87.)

Defendants' motion should be denied based on these facts alone. *See Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1157 (9th Cir. 2010) ("[Section] 101 is designed to establish ownership of a work as between a

commissioning party or employer on the one hand and the commissioned party or employee on the other. It would be unusual and unwarranted to permit third parties such as the instant defendants to invoke § 101 to avoid a suit for infringement when there is no dispute between the two potential owners, and both are plaintiffs to the lawsuit."). Although CMS is not a party to this lawsuit, it has made known that it agrees that NLP owns the copyrights to the Underlying Scripts. (UF 81-87.)

In *Jitrade Inc. v. Charlotte Russe, Inc.,* No. CV 16-5536-DMG (JCX), 2018 WL 2718049, at *3 (C.D. Cal. Jan. 4, 2018), an author (Kim) was employed by a parent company (S&D) and created a design for S&D's subsidiary (Jitrade). Two years after Jitrade registered a copyright for the design, S&D, Jitrade, and Kim entered into a Work For Hire Acknowledgment which confirmed that Kim, while employed by S&D, created the design as a work-for-hire for Jitrade. *Id.* at *1. Jitrade sued defendants for copyright infringement. Defendants moved for summary judgment on the grounds that Jitrade did not have standing to maintain the action, arguing that the Acknowledgment was ineffective in making the design a work-for-hire for Jitrade. *Id.* The Court denied defendants' motion, relying principally on a declaration from the president of S&D and Jitrade that "it was always clearly understood and agreed" between S&D, Jitrade, and Kim that the design at issue belonged to Jitrade from the time it was created. *Id.* at 3. The same result is warranted here. CMS, NLP, Ms. Dzeng, and Ms. Xiong always understood and agreed that the Underlying Scripts belong to NLP. (UF 87.)

Ms. Dzeng's and Ms. Xiong's work on the Underlying Scripts was plainly within the scope of their employment by NLP under the Ninth Circuit's three-prong test: (1) when Ms. Dzeng and Ms. Xiong wrote the Underlying Scripts, their work for NLP involved writing scripts (UF 53-56, 63, 65-67); (2) Ms. Dzeng and Ms. Xiong wrote the Underlying Scripts substantially within the authorized time and space limits, *i.e.*, at the office from 9:30 a.m. to 5:30 p.m. (UF 78), and (3) they did so for NLP so that NLP could film the scripts. (UF 56, 67.) That CMS paid Ms.

20

Dzeng's and Ms. Xiong's salaries and employee benefits is immaterial. *See, e.g., JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125-1126 (9th Cir. 2010) ("Because 'the common-law test contains no shorthand formula or magic phrase that can be applied to find the answer, all of the incidents of the relationship must be assessed and weighed[.]'") (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992)); *Siniouguine v. Mediachase Ltd.*, No. CV 11-6113-JFW (AGRx), 2012 WL 2317364, at *6 (C.D. Cal. June 11, 2012) ("In *JustMed,* 600 F.3d at 1125-1128, the Ninth Circuit held that a computer programmer was an employee under 17 U.S.C. § 101(1) even though there was evidence that he worked from home, that his work was not directly supervised by the company, that he set his own hours, that he performed highly skilled work, that he did not receive benefits, and that he was not treated as an employee for tax purposes."); *Idearc Media Corp. v. Nw. Directories, Inc.*, 623 F. Supp. 2d 1223, 1228-29 (D. Or. 2008) (holding that an artist was "an employee of [plaintiff] under the common law of agency, and that work done by [the artist] is the property of [plaintiff] under the work for hire doctrine," even though the artist was paid by a third party, she reported her hours to the third party, and her employee benefits were solely from the third party).[4]

**B.    Ms. Dzeng's and Ms. Xiong's Employment Agreements Cannot Alter the Underlying Scripts' Status as a Work Made for Hire for NLP, Not CMS**

Defendants rely on Ms. Dzeng's and Ms. Xiong's Employee Obligations Agreements to argue that the Underlying Scripts were works-for-hire for CMS. (UF 33-38.) But the scripts were written within Ms. Dzeng's and Ms. Xiong's scope of employment for NLP, not CMS, and were not works-for-hire for CMS. The Employee Obligations Agreements cannot change this. *See, e.g., TD Bank N.A. v. Hill*, 928 F.3d 259, 272-73 (3d Cir. 2019) ("For an employee's work to receive for-

---

[4] Even if the Underlying Scripts were also within the writers' scope of employment for CMS, Defendants' motion must be denied because there is a genuine dispute of material fact as to which party (CMS or NLP) is the writers' "employer" for purposes of Section 101(1) of the Copyright Act.

hire treatment … the work must actually come within the 'scope of his or her employment.' *Id.* § 101(1). Certain writings, such as negotiated employment agreements, may sometimes help clarify the scope of employment, when considered under general agency-law principles. ... But a bare statement that a particular work is 'for hire,' says nothing about the scope of an individual's employment and cannot suffice on its own. Had Congress intended to permit parties to 'deem' works by employees as 'for hire,' it would have so specified in subsection 101(1), just as it did for independent contractors in subsection 101(2). *Id.* But it did not. …"); *Chromologic LLC v. Yang*, No. SACV 13-01575 JVS (CWx), 2013 WL 12125537, at *5 n.3 (C.D. Cal. May 9, 2013) ("the *CCNV* case indicates that the work made for hire inquiry is broader than any agreement between the parties"); 1 *Nimmer on Copyright* § 5.03[B][1][b][ii] ("an agreement ... whereby works prepared by the employee that are not prepared within the scope of employment are nevertheless deemed to be 'works made for hire' will not in itself convert such works into the 'for hire' category."); *Goldstein on Copyright* § 4.3 (3d ed. 2018) (noting that, unless the work satisfies the "objective" criteria of the work-for-hire doctrine, "A's express agreement that the work prepared by A will constitute a work made for hire by B will not suffice to make the work one for hire, nor to make B the author").

**C.   Even if the Underlying Scripts Were Works for Hire for CMS, or Otherwise Owned by CMS, NLP is CMS's Designee Under Ms. Dzeng's and Ms. Xiong's Employment Agreements**

Defendants further argue that, under Ms. Dzeng's and Ms. Xiong's Employee Obligations Agreements, CMS owns all rights to the Underlying Scripts. (UF 33-38.) While the agreements state that "all Inventions are the sole property of [CMS] … and constitute work made for hire under Section 201" of the Copyright Act, they also state that "You convey and assign to the Company *or its designee*, your entire right, title and interest in and to all Inventions." (UF 59, 70.) NLP is CMS's designee under both agreements for purposes of the Underlying Scripts. (UF 60, 71.)

Under California law, "[i]t is a primary rule of interpretation that contracts must be construed as a whole, that is, from their four corners, and the intention of the parties is to be collected from the entire instrument and not detached portions thereof, it being necessary to consider all of the parts to determine the meaning of any particular part as well as of the whole. Individual clauses and particular words must be considered in connection with the rest of the agreement, and all of the writing and every word of it will, if possible, be given effect." *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020) (quoting *Ajax Magnolia One Corp. v. S. Cal. Edison Co.*, 167 Cal. App. 2d 743, 748 (1959)); *see also* Cal. Civ. Code. § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.")

If the Court were to conclude that the Underlying Scripts were not works-for-hire for NLP, then there is a genuine dispute of material fact as to whether CMS or NLP owns right, title, and interest in the Underlying Scripts. *See Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 828 (9th Cir. 2001) (under California law, "if a party's extrinsic evidence creates the possibility of ambiguity, a court may not rely on the text of the contract alone to determine the intent of the parties.").

**D.    Even if the Underlying Scripts Were Works for Hire for CMS, or Otherwise Owned by CMS, CMS Impliedly Licensed and Ratified NLP's Creation of the Films at Issue**

A non-exclusive license to create a derivative work "may be granted orally or by implication." *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 754 (9th Cir. 2008); *see also U.S. Auto Parts Network, Inc.*, 692 F.3d at 1016 (same); *Effects Assocs. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (same); *Foad Consulting Grp.*, 270 F.3d 825 ("[G]rants of nonexclusive copyright licenses need not be in writing.").

Intent "is the touchstone for determining whether such an implied license has been granted." *Fontana v. Harra*, No. CV 12-10708 CAS (JCGx), 2013 WL 990014, *7 (C.D. Cal. Mar. 12, 2013) (quoting *Est. of Hevia v. Portrio Corp.*, 602 F.3d 34, 41 (1st Cir. 2010)). "Intent to create a license exists when an author creates a work

with the knowledge and intention that it will be used by the licensee for a specific purpose." *Id.* at *4 (citing *Bangkok Broad. & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1111 (C.D. Cal. 2010)); *see also SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp.2d 301, 317 (S.D.N.Y. 2000) (same).

The relevant inquiry here is whether the Underlying Scripts were created with the knowledge and intent that they would be used to create the Films at Issue. *Fontana*, 2013 WL 990014, at *8. As shown above, it is undisputed that the Underlying Scripts were created for NLP, specifically *for filming by NLP*, and that CMS impliedly licensed NLP to create the Films at Issue. (UF 56, 67, 81-88.)[5]

Moreover, CMS never has complained about NLP's creation of the Films at Issue based on the Underlying Scripts. That is because CMS always understood and agreed that the Underlying Scripts belong to NLP, and that NLP owns the copyrights to those scripts. (UF 87.) CMS also ratified NLP's creation of the Films at Issue. (UF 89.) "Such a ratification is sufficient to insulate a holder of copyright in a derivative work from charges by an infringer of that copyright that the derivative work was created without the permission of the holder of the original copyright." *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34, n.6 (2d Cir. 1982).

CMS, NLP, Ms. Dzeng, and Ms. Xiong all agree that the Underlying Scripts were works-for-hire for NLP. If the Court were to conclude that CMS nonetheless owns right, title, or interest to the Underlying Scripts, the evidence proves that CMS authorized NLP to use the scripts to create the Films at Issue. At a minimum, there is a genuine dispute of material fact on the issue.

---

[5] Defendants point to Mr. Zhao's deposition testimony to argue that "NLP has not received any license … of rights to the Underlying Scripts from anyone." (UF 42-43.) Defendants' counsel only asked Mr. Zhao whether NLP was *granted* a license. (*Id.*) They did not ask about an *implied* license. (*Id.*) Mr. Zhao was clear, however, that the Underlying Scripts were created for filming by NLP. (UF 56, 67.)

## XI.   ARGUMENT (DEFENDANTS' REPLY)

### A.   NLP Does Not Raise a Triable Issue on Its Lack of a Valid Copyright to the Films at Issue

By failing to argue otherwise, NLP tacitly concedes that its alleged copyrights to the Films at Issue are valid only *if* NLP had rights to the Underlying Scripts.  The uncontroverted testimony of NLP's representative and plain language of the employment contracts show that Crazy Maple Studio—not NLP—had the rights to the Underlying Scripts.  The opposition does not refute these conclusions.

NLP admits Crazy Maple Studio employees Ms. Dzeng and Ms. Xiong wrote the Underlying Scripts.  (UF 8-14, 17, 23.)  It also admits that the writers' employment agreements with Crazy Maple Studio (i) "constitute[] the complete understanding" between the writers and Crazy Maple Studio, (ii) provide that the works of authorship the screenwriters create during their "employment with [Crazy Maple Studio]" are the "sole property of [Crazy Maple Studio]," and (iii) provide that the screenwriters "convey and assign to [Crazy Maple Studio] or its designee" their "entire right" to those works."  (UF 33-36, 39.)

In seeking to muddle the record, NLP submits declarations that seek to redefine Ms. Dzeng's and Ms. Xiong's employment status.  It then seeks to rewrite history by claiming without evidence that NLP received rights to the Underlying Scripts from Crazy Maple Studio.  But the Court need look no further than the employment agreements' plain language and the deposition testimony of NLP's Rule 30(b)(6) witness, which make clear that judgment for Defendants is proper.

As the Ninth Circuit has held, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012).  This "sham affidavit rule" prevents "'a party who has been examined at length on deposition' from 'rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony,' which 'would greatly diminish the utility of summary judgment as a procedure for screening out

sham issues of fact.'" *Id.* (citations omitted).  To ignore a declaration under the sham affidavit rule, the Court need only find that (i) "the contradiction is a sham" and (ii) the "inconsistency between a party's deposition testimony and subsequent affidavit [is] clear and unambiguous." *Id.* (citations omitted).  Courts routinely disregard affidavits intended to defeat summary judgment where they are "vastly different than" and "directly contradict" prior deposition testimony.  *See, e.g.*, *Call Delivery Sys., LLC v. Morgan*, No. 2:20-cv-04637-CBM-(PDx), 2022 WL 3574433, at *3-4 (C.D. Cal. Mar. 16, 2022) (disregarding sham affidavit and granting summary judgment where plaintiff's declaration listed different job duties that he did not mention in deposition); *Maurey v. Univ. of S. Cal.*, 87 F. Supp. 2d 1021, 1037 (C.D. Cal. 1999) (disregarding sham declaration that plaintiff did not believe he was bound by contracts when he testified he read, understood, and signed them), *aff'd by* 12 F. App'x 529 (9th Cir. 2001).

As discussed below, the declarations NLP submits in opposition are indeed "sham declarations" that directly conflict with its witnesses' unambiguous testimony at deposition.  NLP has failed to create a genuine factual dispute.

**1.    NLP cannot avoid that the Underlying Scripts were works-for-hire for Crazy Maple Studio—not NLP**

After conceding that Ms. Xiong and Ms. Dzeng were employed and paid by Crazy Maple Studio when they wrote the Underlying Scripts (UF 17, 23, 31-32), NLP argues that Ms. Dzeng and Ms. Xiong were *also* "employed by NLP" and wrote the Underlying Scripts "within the scope of [their] employment for NLP." (*See* Opp.)  But NLP's corporate witness, Mr. Zhao, said precisely the opposite. He admitted that the screenwriters had never been employed by NLP:

> **Q:**    [Ms. Dzeng] didn't have any employment contract with New Leaf Publishing; correct?
>
> **A:**    Correct.

(Zhao Tr. at 101:24-102:1; *see also* UF 15.)

> **Q:** She didn't – [Ms. Xiong] never had an employment contract with New Leaf Publishing; correct?
>
> **A:** Not to my knowledge.

(Zhao Tr. at 112:21-23; *see also* UF 21.)

The Court should reject NLP's declarations, which now claim that Ms. Dzeng and Ms. Xiong were employed by NLP. *Yeager*, 693 F.3d at 1081 (rejecting sham declaration where "the disparity between the affidavit and deposition is so extreme that the court must regard the differences between the two as contradictions" (citation omitted)).

Contrary to NLP's lawyerly argument, Ms. Dzeng's and Ms. Xiong's employment agreements with Crazy Maple Studio—the only employment agreements they have—say nothing about employment by NLP.  Indeed, Ms. Xiong's agreement could not have mentioned NLP because NLP was formed more than two years after the agreement was signed.  (UF 24.)  NLP's assertion that the agreements are "also with" NLP because they "include obligations" to NLP and other "Related Companies" is unsupported.  The screenwriters do not become employees of other companies by merely having alleged "obligations" to them.  NLP cites no authority to suggest that is the standard.  Moreover, any notion that NLP employed the screenwriters is belied by the undisputed fact that Crazy Maple Studio—not NLP, or any other "related companies"—paid Ms. Dzeng's and Ms. Xiong's salaries, bonuses, and benefits.  (UF 31-32); *see J2F Prods. Inc. v. Sarrow*, No. CV09-7000-JST (FFMx), 2010 WL 11515282, at *5 (C.D. Cal. Nov. 16, 2010) (fact that company never compensated author, paid Social Security or Medicare employer's tax, or reported him to IRS "alone refute[d]" claim he was an employee).  NLP and the screenwriters' apparently mistaken views of the legal effect of the agreements do not overcome the agreements' plain language.

The authorities NLP cites underscore that the Underlying Scripts were works for hire *by Crazy Maple Studio*.  Sections 101 and 201(b) of the Copyright Act

27

determine ownership based on the identity of the "employee" and the "employer." 17 U.S.C. §§ 101, 201(b). Section 201(b) provides that "*the employer*" is the author unless the parties "expressly agreed otherwise in a written instrument signed by them." 17 U.S.C. § 201(b) (emphasis added). Similarly, Section 101 provides that a work-for-hire is "a work prepared by *an employee* within the scope of his or her *employment*." 17 U.S.C. § 101(1) (emphasis added); *see also* 3 Nimmer on Copyright § 10.03 (2025) (discussing conveyance from "an employee" to "the employer"). The only employee-employer relationship here is between the screenwriters and Crazy Maple Studio.

Nothing in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ("*CCNV*"), which addresses the distinction between an "employee" and "independent contractor," changes this analysis. Rather, *CCNV* shows that an employee is someone "hired" by an employer. As the Supreme Court noted, "the language of § 101(1) . . . focuses on the relationship between *the hired and hiring parties*." *Id.* at 741 (emphasis added). That interpretation follows from the legislative history, which confirms that "employee" was "meant to refer to a hired party *in a conventional employment relationship*." *Id.* at 743 (emphasis added). And the factors the Supreme Court listed as "determining whether a hired party is an employee" all assume that the hired party is compensated by the hiring party— *e.g.*, the factors include "method of payment" and "tax treatment." *Id.* at 751-52.

In virtually all the cases NLP cites, the "employer" for work-for-hire purposes is the company that hired and paid the author. *See, e.g.*, *Nirvana L.L.C. v. Marc Jacobs Int'l L.L.C.*, No. LA CV18-10743 JAK (SK), 2023 WL 11821416, at *11 (C.D. Cal. Dec. 21, 2023) (company claiming copyright ownership (Geffen) paid the purported author (Fisher));[6] *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1126

---

[6] NLP cites *Nirvana* in arguing that "[a]n individual may be employed without a written agreement," but the screenwriters here do not just lack *written* employment agreements with NLP—they lack any employment agreements with NLP whatsoever. (UF 16, 22.) The undisputed fact that they are paid by Crazy Maple Studio, not NLP, reinforces that fact. (UF 31-32.)

(9th Cir. 2010) (employee was "hired" and "paid" by the employer even though he did not receive "benefits"); *Siniouguine v. Mediachase Ltd.*, No. CV 11-6113-JFW (AGRx), 2012 WL 2317364, at *7 (C.D. Cal. June 11, 2012) (employee "received a 'monthly' salary" from the employer).  No dispute exists about who hired and paid the screenwriters here: Crazy Maple Studio.  (UF 31-32.)

In *Idearc Media Corp. v. Northwest Directories, Inc.*, the only case NLP cites where the copyright owner did not compensate the author, the author's employment contract with the separate company that paid her expressly provided that the copyright owner "own[ed] the copyright to any work that she create[d]." 623 F. Supp. 2d 1223, 1228-29 (D. Or. 2008).  Here, by contrast, the screenwriters' employment agreements with Crazy Maple Studio state that the works they create are the "sole property" of Crazy Maple Studio.  (UF 33.)

NLP's reliance on *Jitrade Inc. v. Charlotte Russe, Inc.* is also misplaced. *Jitrade* shows that when an author who is hired and paid by a parent company creates work for a subsidiary, the parent company owns the copyright in the first instance.  No. CV 16-5536-DMG (JCx), 2018 WL 2718049 (C.D. Cal. Jan. 4, 2018).  Like the screenwriters here, the author in *Jitrade* (Kim) had a "Standard Labor Contract" with the parent company (S&D) to develop designs in exchange for wages and other compensation.  *Id.* at *1.  Author Kim created the designs at issue for S&D's subsidiary (Jitrade) while employed under his contract with S&D. *Id.*  The court agreed that copyright ownership vested in S&D—the parent company.  *Id.* at *3 (addressing assignment of "S&D's copyright").

Overlooking this important distinction, NLP focuses instead on *Jitrade*'s finding that the third-party defendant could not "raise the lack of a written [assignment] agreement" between S&D and Jitrade as a defense.  *Id.*  But the facts underlying that finding are easily distinguishable.  Unlike here, S&D and Jitrade had an agreement, albeit unwritten, under which S&D assigned ownership of the disputed copyright to Jitrade.  *Id.*  Here, NLP's corporate representative testified

1   that Crazy Maple Studio never assigned any intellectual property rights to NLP, and

2   that Crazy Maple Studio and NLP never had any agreement, written or unwritten,

3   between them.  (UF 42-44; Zhao Tr. at 228:4-13; *see infra*, Section XI.A.2.)

4          The other cases on which NLP relies assume the "threshold matter" that the

5   authors are employees and jump to whether the works were created "within the

6   scope of [the authors'] employment."  *U.S. Auto Parts Network, Inc. v. Parts Geek,*

7   *LLC*, 692 F.3d 1009, 1018 (9th Cir. 2012) (citation omitted) ("As a threshold

8   matter, it is undisputed that Thomason was a Partsbin employee."); *Jules Jordan*

9   *Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1155 (9th Cir. 2010) ("It was

10  undisputed . . . that Gasper was an employee of JJV.").  There is no basis to apply

11  the within-the-scope-of-employment test here.  Ms. Dzeng and Ms. Xiong were not

12  NLP employees, so nothing they created could be "within the scope" of any

13  employment by NLP.

14         NLP next argues that Ms. Dzeng and Ms. Xiong did not write the Underlying

15  Scripts within the scope of their employment with Crazy Maple Studio.  Incorrect.

16  Their employment agreements with Crazy Maple Studio explicitly anticipated that

17  they would create "works of authorship" and provide that Crazy Maple Studio will

18  own those works.  (UF 33-36.)  And again, Crazy Maple Studio—not NLP or any

19  other company—paid the screenwriters.  (UF 31-32.)  The writers were paid to

20  write.  None of the cases NLP cites in Section X.B refutes the basic principle that

21  works created during the employees' employment (and within the scope of their

22  employment agreements) are works-for-hire by the employer.

23         Finally, contrary to NLP's contention, nothing in *Jules Jordan* prevents Top

24  Innovations from challenging NLP's failure to obtain copyrights from Crazy Maple

25  Studio.  The Ninth Circuit in *Jules Jordan* held that a third-party defendant could

26  not challenge a copyright infringement claim when the two potential owners were

27  both joined as plaintiffs.  *Jules Jordan*, 617 F.3d at 1157.  That is not the case here

28  where NLP elected to bring this lawsuit without joining Crazy Maple Studio.

Where not all potential owners are plaintiffs, the Ninth Circuit has made it clear that "a third party is not foreclosed from challenging a plaintiff's ownership for purposes of standing." *DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 986-88 (9th Cir. 2017) (affirming grant of summary judgment where the alleged infringer showed that the plaintiff photography agency did not have an exclusive license from its photographers).

### 2. NLP cannot show that Crazy Maple Studio gave it copyrights to the Underlying Scripts, whether by designation, implied license, or ratification

Further conflicting with its deposition testimony, NLP contends that CMS agreed to give it rights to the scripts in various ways—by designation, implied license, and oral ratification. NLP's representative Mr. Zhao testified otherwise.

Mr. Zhao conceded that NLP had never "been granted a license in any way related to the [Between Two Alphas] script by anyone." (Zhao Tr. at 45:24-46:2.) He testified the same for the other scripts as well, each time denying that NLP had been granted "a license" by anyone. (UF 43 (citing transcript).) Mr. Zhao's declaration submitted for NLP's opposition now claims the opposite—that Crazy Maple Studio "impliedly licensed NLP" to create the Films at Issue from the Underlying Scripts. (Zhao Decl. ¶ 45.) The opposition tries to explain away the discrepancy by arguing in a footnote that Mr. Zhao was asked "whether NLP was *granted* a license," not "about an *implied* license." But Mr. Zhao's deposition testimony is unequivocal. He did not identify any license, written or unwritten, when repeatedly asked to do so.

Mr. Zhao's testimony was not a mistake or a matter of imprecise language. He not only denied any license, but he also broadly denied the existence of *any agreement* concerning intellectual property between Crazy Maple Studio and New Leaf Publishing, "written" or "not written":

> **Q:**   So I think you -- you clarified that there was no written intellectual property agreement between New Leaf Publishing and Crazy Maple Studio; is that correct?

31

**A:**     Is that to me?

**Q:**     Yes.

**A:**     Correct.

**Q:**     Is there *any other agreement not written* with regard to intellectual property rights between those two companies?

**A:**     Not to my knowledge.

(Zhao Tr. at 228:4-13 (emphasis added); *see also* UF 42.)

Again, NLP's self-serving declarations that contradict its corporate representative's testimony must be disregarded. *See Yeager*, 693 F.3d at 1080; *Call Delivery Sys.*, 2022 WL 3574433, at *3-4.

NLP's assertion that Crazy Maple Studio "ratified NLP's creation of the Films at issue" simply repackages its baseless implied license claim:  both rely on Crazy Maple supposed acquiescence to NLP's use of the Underlying Scripts. NLP's "ratification" argument also fails because NLP has not identified (and cannot identify) any *prior agreement* that it supposedly "ratified."  *See Davis v. Blige*, 505 F.3d 90, 107-08 (2d Cir. 2007) (analyzing effectiveness of "'ratifying' an earlier oral agreement").  As explained above, there was no such prior agreement, either written or unwritten.  To the extent Crazy Maple Studio seeks to ratify NLP's *use* of the Underlying Scripts now, it is too late.  As Top Innovations explained, NLP must have had valid rights to the Film at Issue *at the time it registered them* to have obtained valid copyright registrations—a prerequisite for filing this lawsuit.

Finally, NLP's contention that NLP is Crazy Maple Studio's "designee" does not create a material factual dispute: unless the Court *also* finds that the Underlying Scripts were not works-for-hire by Crazy Maple Studio, the screenwriters had no rights to transfer to NLP.  The screenwriters' agreements provide that: "[Y]ou convey and assign to [Crazy Maple Studio] or its designee, *[your] entire right, title and interest*" in the "Inventions."  (UF 34-35 (emphasis added).)  Even if *arguendo* Crazy Maple Studio made NLP its designee, NLP would not have received rights to

the Underlying Scripts because the screenwriters could only "convey and assign" *their* rights.  The screenwriters' employment agreements dictate that the works become the "sole property" of Crazy Maple Studio as "work[s] made for hire under Section 201" of the Copyright Act.  (UF 33.)  Accordingly, the copyrights to the Underlying Works vested with Crazy Maple Studio and could not later be "convey[ed]" or "assign[ed]" *by the screenwriters*.

### B.    NLP's Failure to Own Rights to the Films at Issue When It Registered Them and Brought This Action Is Fatal to Its Claim

NLP tacitly concedes, as it must, that a copyright registration is invalid if the registering party was not the owner at the time of registration.  Because NLP did not own the rights in 2023 when it applied for copyright registrations, its registrations for the Films at Issue are invalid and there is no basis for this action.

## XII.   CONCLUSION (MOVANTS' STATEMENT)

For the reasons set forth above, Top Innovations respectfully requests that the Court grant summary judgment in its favor.

## XIII.  CONCLUSION (PLAINTIFF'S OPPOSITION)

For the reasons above, NLP respectfully requests that the Court deny Defendants' motion for summary judgment and make a finding of fact that NLP is the valid owner of the works at issue and the copyrights thereto.

Dated:      July 31, 2025                    MORRISON & FOERSTER LLP


By: */s/ Matthew J. Wyatt*
        Matthew J. Wyatt

*Attorney for Defendants*
TOP INNOVATIONS LLC and
TOP INNOVATIONS US, LLC

Dated:        July 31, 2025                    NIXON PEABODY LLP


                                               By: */s/ Erica Van Loon*
                                                   Erica Van Loon

                                               *Attorney for Plaintiff*
                                               NEW LEAF PUBLISHING, INC.

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Top Innovations LLC and Top Innovations US, LLC, certify that each party's briefing does not exceed 25 pages, exclusive of tables of contents and authorities, which complies with Section IX.D of the Court's Civil Standing Order.


Dated:      July 31, 2025                    MORRISON & FOERSTER LLP


By: */s/ Matthew J. Wyatt*
Matthew J. Wyatt

*Attorney for Defendants*
TOP INNOVATIONS LLC and
TOP INNOVATIONS US, LLC

35