UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEW LEAF PUBLISHING, INC., <br><br> Plaintiff, <br><br> v. <br><br><br> TOP INNOVATIONS LLC; TOP INNOVATIONS US, LLC, <br><br> Defendants. | Case No.: 2:24-cv-04676-MEMF-SSC <br><br> **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 71-1]** |

Before the Court is the Motion for Summary Judgment filed by Defendants. Dkt. No. 71-1 ("Motion"). For the reasons stated herein, the Court hereby DENIES the Motion.

**I.     Factual Background**

This action arises from New Leaf Publishing, Inc.'s ("NLP") allegation that Defendants Top Innovations LLC and Top Innovations US, LLC ("Defendants") committed copyright infringement when they published the six films at issue. The parties dispute who owns the copyrights to the six underlying scripts to the six films at issue: Defendants rely on employment agreements between the screenwriters and Crazy Maple Studio ("CMS")—NLP's parent company—to assert that CMS and *not* NLP owns the copyrights. NLP responds that the screenwriters were employed by *both* CMS and

1

NLP at the time, although they only had a written agreement with CMS, and that the scripts were written as part of the scope of employment with NLP and *not* CMS.

## II. Procedural History

On June 4, 2024, NLP filed a complaint in the U.S. District Court for the Central District of California against Defendants Top Innovations LLC and Top Innovations US, LLC. Dkt. No. 1. Plaintiff's complaint alleges three causes of action: (1) direct copyright infringement; (2) violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201; and (3) Unfair Competition, Cal. Bus. & Prof. Code § 17200. *See* Dkt. No. 1. On February 21, 2025, Plaintiff filed a Second Amended Complaint alleging three causes of action: (1) Copyright Infringement – Mobile Applications; (2) Copyright Infringement – Other Platforms; and (3) Violation of the Lanham Act, 15 U.S.C. § 1125(a). Dkt. No. 39. On May 27, 2025, the Court issued an Order granting Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, dismissing the second and third causes of action without leave to amend. Dkt. No. 53.

On July 31, 2025, Defendants filed the instant, fully integrated Motion for Summary Judgment, which includes Plaintiff's Opposition and Defendants' reply to Plaintiff's opposition. Dkt. No. 71-1 ("Motion"). On October 9, 2025, the Court held a hearing on the Motion.

## III. Applicable Law

### A. Motions for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production

1  and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine*
2  *Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the
3  moving party must either (1) produce evidence negating an essential element of the nonmoving
4  party's claim or defense or (2) show that there is an absence of evidence to support the nonmoving
5  party's case. *Id.*

6  Where a moving party fails to carry its initial burden of production, the nonmoving party has
7  no obligation to produce anything, even if the nonmoving party would have the ultimate burden of
8  persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for
9  summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its
10 burden of production, the burden shifts to the nonmoving party to produce evidence showing a
11 genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances,
12 the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the
13 depositions, answers to interrogatories, and admissions on file, designate specific facts showing that
14 there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal
15 quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a
16 genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule
17 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion,
18 against a party who fails to make a showing sufficient to establish the existence of an element
19 essential to that party's case, and on which that party will bear the burden of proof at trial.").

20 A party cannot create a genuine issue of material fact simply by making assertions in its
21 legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235,
22 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for
23 the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly
24 address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R.
25 Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only
26 required to consider evidence set forth in the moving and opposing papers and the portions of the
27 record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.
28 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be

insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.

To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

## IV.   Findings of Fact[1]

The six films (the "Films at Issue") for NLP's copyright infringement claim are based entirely on the six corresponding screenplay scripts (the "Underlying Scripts"): (1) the film "Fatal Temptation: Between Two Alphas" is based entirely on the script "Between Two Alphas"; (2) the film "Fated to My Forbidden Alpha" is based entirely on the script "Fated to My Forbidden Alpha"; (3) the film "Goodbye, My CEO!" is based entirely on the script "Goodbye, My CEO"; (4) the film "Marry Me, Mr. White" is based entirely on the script "Marry Me, Mr. White"; (5) the film "My Gorgeous Wife is an Ex-Convict" is based entirely on the script "My Gorgeous Wife is an Ex-Convict"; and (6) the film "My Husband Killed Me, then I Won the Mega Ball!" is based entirely on the script "My Husband Killed Me, then I Won the Mega Ball." UF ¶¶ 1-6.

Abby (Yuki) Dzeng wrote and edited the scripts "Between Two Alphas" and "Fated To My Forbidden Alpha" in their entirety. *Id.* ¶¶ 8-9. Mibao (Sophie) Xiong wrote and edited the scripts "Goodbye My CEO," "Marry Me, Mr. White," "My Gorgeous Wife Is an Ex-Convict," and "My Husband Killed Me, then I Won the Mega Ball." *Id.* ¶ 10. Kayla McGinnis revised small sections of dialog in the script "My Gorgeous Wife Is an Ex-Convict" and edited it for grammar, typos, and

---

[1] The facts set forth below are taken from the parties' respective Joint Statements of Uncontroverted Facts. Dkt. Nos. 71-2, 71-3 ("UF"). To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute. And the Ninth Circuit has recognized that "a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) (emphasis added)).

In making these Findings of Fact, the Court considered Defendants' Evidentiary Objections. Dkt. Nos. 71-2, 71-3. The Court did not find any evidence objected to essential to finding any fact stated herein, and therefore need not reach the Evidentiary Objections.

formatting. *Id.* ¶ 11. Other than McGinnis's edits to that one script, no one other than Xiong wrote, edited, or otherwise contributed to the scripts "Goodbye My CEO", "Marry Me, Mr. White," "My Gorgeous Wife Is an Ex-Convict," and "My Husband Killed Me, then I Won the Mega Ball." *Id.* ¶ 13.

Xiong signed an employment agreement with Crazy Maple Studio ("CMS") on November 18, 2019, and afterwards she wrote the scripts "Goodbye My CEO," "Marry Me, Mr. White," "My Gorgeous Wife Is an Ex-Convict," and "My Husband Killed Me, then I Won the Mega Ball." *See id.* ¶ 23. Dzeng signed an employment agreement with CMS on June 16, 2022, and afterwards she wrote the scripts "Between Two Alphas" and "Fated To My Forbidden Alpha." *See id.* ¶ 17. McGinnis signed an employment agreement with CMS on June 29, 2023. *Id.* ¶ 28. Dzeng reports directly to Xiong, Xiong reports to Zhao, and McGinnis reported to Xiong. *See id.* ¶¶ 62, 72, 75. While Dzeng, Xiong, and McGinnis were working on the Underlying Scripts, CMS paid for their salaries and employee benefits. *Id.* ¶ 31.

Dzeng's and Xiong's employment agreements with CMS state: "You acknowledge, represent and agree: [¶] 1. that all Inventions are the sole property of the Company, and that all tangible expressions of the Inventions, including, without limitation, all documents, instruments, sketches, drawings, notes, records, plans, specifications, manuals and tapes, and all reproductions, copies or facsimiles thereof, have been developed, made or invented exclusively for the benefit of and are the sole and exclusive property of the Company and constitute work made for hire under Section 201 of Title 17 of the United States Code." *Id.* ¶ 33. Both agreements define "Invention" as "[a]ny ideas, concepts, inventions, designs, products, software, documents or other works of authorship (in any medium), improvements, modifications, processes or practices conceived, created or developed in whole or in part by [you] during the period of [your] employment by the Company." *Id.* ¶ 36. Both agreements further state: "You acknowledge, represent and agree . . . that [you] convey and assign to the Company or its designee, [your] entire right, title and interest in and to all Inventions, works of authorship, developments, concepts, discoveries, ideas, trademarks and trade secrets, whether or not patentable or registrable under copyright or similar laws which [you] may solely or jointly develop, conceive or reduce to practice, during [your] employment." *Id.* ¶ 34. Both agreements define the

term "Company" as "CRAZY MAPLE STUDIO, INC." *Id.* ¶ 35. Dzeng and Xiong have not modified their employment agreements. *Id.* ¶ 41.

Both employment agreements state: "This Employee Obligations Agreement (the "Agreement"), effective as of June 21, 2022 [or effective as of 11/18/19], sets forth, among other things, the undersigned employee's ("You" or "Your" or "Yourself") obligations with respect to the intellectual property, confidential, trade secrets, and otherwise proprietary information of CRAZY MAPLE STUDIO, INC, (the "Company") and the other "Related Companies" as defined below." *See id.* ¶¶ 57, 68. Dzeng's employment agreement defines "Related Companies" as "collectively, the Company and each business, entity or company from time to time controlling, controlled by, or under common control with, the Company, including without limitation Crazy Maple Services Company, New Leaf Publishing Inc., and any various interest entity thereof . . . ." *Id.* ¶ 58. And Xiong's employment agreement defines "Related Companies" as "collectively, the Company and each business, entity or company from time to time controlling, controlled by, or under common control with, the Company . . . ." *Id.* ¶ 69.

NLP was formed in June 2022 for the purpose of having a separate entity own and produce content for the ReelShort app. *Id.* ¶ 47. CMS is the parent company and sole owner of NLP. *Id.* ¶ 49. NLP has business hours from 9:30 AM to 5:30 PM. *See* UF ¶ 78.

V. **Discussion**

Defendants move for summary judgment contending that the undisputed facts do not support New Leaf Publishing's claim for copyright infringement. Motion at 14-17. For the reasons discussed below, the Court DENIES summary judgment to Defendants.

A. **NLP's four declarations submitted in opposition are not "sham declarations."**

Defendants ask the Court to strike the Zhao Declaration, Xiong Declaration, Dzeng Declaration, and Bhagat Declaration submitted in opposition to the Motion for Summary Judgment on the grounds that these declarations contradict Zhao's 30(b)(6) deposition testimony. *See* Motion at 25-26.

The Ninth Circuit recognizes a "sham affidavit" rule on motions for summary judgment, where "a party cannot create an issue of fact by an affidavit contradicting his prior deposition

6

1    testimony." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Kennedy v.*
2    *Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)).

3    However, the Ninth Circuit has cautioned courts to be careful in applying the sham affidavit
4    rule. "[I]t must be recognized that the sham affidavit rule is in tension with the principle that a
5    court's role in deciding a summary judgment motion is not to make credibility determinations or
6    weigh conflicting evidence." *Id.* There are two "important limitations" on the rule. *Id.* First, the rule
7    does not apply in every case were "a contradictory affidavit is introduced to explain portions of
8    earlier deposition testimony." Before applying the rule, "the district court must make a factual
9    determination that the contradiction was actually a 'sham.'" *Id.* Second, "inconsistency between a
10   party's deposition testimony and subsequent affidavit must be clear and unambiguous." *Id.* Put
11   another way, only that affidavit testimony that "flatly contradicts" the deposition testimony should
12   be excluded.  *See Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 267 (9th Cir. 1991) (explaining that
13   the rule is concerned with "'sham' testimony that *flatly contradicts* early testimony in an attempt to
14   'create' an issue of fact and avoid summary judgment" (emphasis added)). The rule should not be
15   invoked to prohibit a party from "from elaborating upon, explaining or clarifying prior testimony
16   elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest
17   discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition
18   affidavit." *Van Asdale*, 577 F.3d at 999 (quoting *Messick v. Horizon Indus. Inc.*, 62 F.3d 1227, 1231
19   (9th Cir. 1995)).

20   The Court evaluates Defendants' arguments below. None of the purported contradictions in
21   the identified testimony are sufficiently clear and unambiguous to justify excluding that testimony
22   under the sham affidavit rule.

23   First, Defendants claim that all the declarations contradict Zhao's deposition regarding
24   Dzeng's and Xiong's employment at NLP. Motion at 27.

25   According to Zhao's Declaration, in regards to Dzeng, Zhao states: "When Ms. Dzeng wrote
26   and edited the scripts/screenplays for the films … she was employed by NLP as narrative designer,"
27   and that she "edited the scripts/screenplays for the films … for NLP, within the scope of her
28   employment for NLP, under the supervision and control of Ms. Xiong, for filming by NLP." Zhao

1  Decl. ¶¶ 17, 18. Bhagat's Declaration, Xiong's Declaration, and Dzeng's Declaration all state the
2  exact same fact for Dzeng. *See* Bhagat Decl., ¶¶ 8, 9; Xiong Decl., ¶¶ 6, 7; Dzeng Decl., ¶¶ 4, 5. And
3  in regards to Xiong, Zhao's Declaration states: "When Ms. Xiong wrote and edited the
4  scripts/screenplays for the films … she was employed by NLP," and that she "edited the
5  scripts/screenplays for the films … for NLP, within the scope of her employment for NLP, under
6  [Zhao's] supervision and control, for filming by NLP." Zhao Decl. ¶¶ 24, 25. Bhagat's Declaration,
7  Xiong's Declaration, and Dzeng's Declaration all state the exact same fact for Xiong. *See* Bhagat
8  Decl., ¶¶ 19, 20; Xiong Decl., ¶¶ 10, 11. Defendants contend this is contradictory.

9        Defendants point to deposition testimony that purportedly contradicts the above declarations.
10  Zhao testified in deposition that Dzeng was an employee of NLP but when Dzeng wrote the
11  Underlying Scripts, her contract was with CMS. *See* Zhao Dep. 101:13-102:1. Zhao also testified
12  that Dzeng had always worked for NLP, but Dzeng's employment with CMS started in 2022, and
13  she had been employed "continuously" at CMS. *See id.* at 102:2-15. In regards to Xiong, Zhao
14  testified in deposition that Xiong worked for NLP when she wrote the four Underlying Scripts but
15  that her employment agreement was with CMS, she never had any employment agreement with
16  NLP, and that she has been employed continuously by CMS. *See* Zhao Dep. 112:15-113:7, 120:19-
17  23. However, Zhao also testified in the deposition that Dzeng, Xiong, and McGinnis were also
18  employed by NLP and that the Underlying Scripts were written by Xiong and Dzeng for filming by
19  NLP and written within the scope of employment as employees of NLP. *See id.* 219:16-222:24.

20        The Court finds that the declarations and deposition testimony do not clearly contradict each
21  other on these issues. *See Van Asdale*, 577 F.3d at 998. The fact that when Dzeng and Xiong wrote
22  the Underlying Scripts, their employment contracts were with CMS, and Dzeng and Xiong both had
23  been "continuously" employed at CMS does not directly contradict the declarations that state they
24  were also employed by NLP when they wrote the Underlying Scripts and edited the scripts and that
25  they wrote and edited the scripts within the scope of employment for *NLP*, not CMS. It is not
26  contradictory because as explained below, an employee can have two employers, and Zhao's
27  declaration can be read as merely clarifying that he meant NLP was Dzeng's and Xiong's employer.
28

Furthermore, the Court need not address Defendants' arguments that the claims in Zhao's and Bhagat's declarations that "NLP is CMS's designee," that "CMS impliedly licensed NLP to create the Films at Issue," and that "CMS orally ratified NLP's creation of the Films at Issue," *see* UF ¶¶ 37 (Reply), 88, 89 (Opposition); *see also* Motion at 31-32, are all shams, because the Court does not rely on these claims in finding a genuine issue of material fact. The Court also need not address Defendants' argument that the claim in Zhao's, Bhagat's, Dzeng's, and Xiong's declaration that "it was always understood and agreed by and between CMS, NLP, Ms. Dzeng, and Ms. Xiong that the scripts/screenplays for the films … belong to NLP, and that NLP owns the copyrights to those scripts/screenplays," *see* UF ¶ 87 (Opposition), is a sham, for the same reason. Accordingly, the Court finds that none of the four declarations (the Zhao Declaration, Bhagat Declaration, Dzeng Declaration, and Xiong Declaration) contain testimony that sufficiently contradicts prior deposition testimony that would justify striking these declarations as shams.[2]

### B. There is a genuine dispute of material fact as to whether Dzeng, Xiong, and McGinnis created the Underlying Scripts as works for hire for NLP.

A "work made for hire" is (1) "a work prepared by an employee within the scope of his or her employment" or (2) "a work specially ordered or commissioned for use." 17 U.S.C. § 101. If a work is made for hire, "the employer or other person for whom the work was prepared is considered the author ... and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in copyright." 17 U.S.C. § 201(b). Therefore, "an agreement between employer and employee whereby works prepared by the employee that are not prepared within the scope of employment are nevertheless deemed to be 'works made for hire,' will not in itself convert such works into the 'for hire' category." 1 Nimmer on Copyright § 5.03

Defendants contend that Dzeng and Xiong were employees of CMS, not NLP, and thus the Underlying Scripts made by them were works made for hire for CMS. *See* Motion at 17. NLP contends that (1) Dzeng, Xiong, and McGinnis were employees of both CMS and NLP at the time

---

[2] For the reasons discussed in this paragraph, the Court need not address the license claim in UF ¶ 43. *See* Motion at 31.

9

the scripts written and (2) the scripts were written within the scope of their employment with NLP, not CMS, making them works made for hire for NLP. *See* Motion at 19-21.[3]

        i. <u>A reasonable jury could find that Dzeng, Xiong, and McGinnis were working as employees of NLP at the time they wrote the Underlying Scripts.</u>

The Supreme Court held that when determining between an employee or independent contractor, the "term 'employee' [in 17 U.S.C. § 101(1)] should be understood in light of the general common law of agency." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 741 (1989). "Congress meant [the term 'employee'] to refer to a hired party in a conventional employment relationship." *Id.* at 743. So to determine whether a person is an employee, the Court considers the "hiring party's right to control the manner and means by which the product is accomplished," which includes factors like "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." *Id.* at 751-52. "No one of these factors is determinative." *Id.* at 752.

Although the issue in this Motion is not whether Dzeng, Xiong, and McGinnis are independent contractors or employees, the Court will apply this common law of agency test to determine if Dzeng, Xiong, and McGinnis could reasonably be viewed as employees of NLP— keeping in mind that it is undisputed that they were also employees of CMS at this time. "[S]tatutes are presumed not to disturb the common law, 'unless the language of a statute [is] clear and explicit for this purpose,'" which is why the Ninth Circuit has applied the common law of agency in interpreting federal copyright law. *See, e.g.*, *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1053 (9th Cir. 2017) (applying the common law of agency to copyright claim under the Digital

---

[3] NLP contends that McGinnis was working under Xiong for one of the Underlying Scripts and was thus employed for NLP for purposes of copyright protection, *see* Motion at 9, but for the reasons discussed below, there is a question of fact as to whether McGinnis, like Dzeng and Xiong, was an NLP employee.

10

Millenium Copyright Act's safe harbor provision); *Aquarian Found., Inc. v. Lowndes*, 127 F.4th 814, 820 (9th Cir. 2025) (applying the common law of agency to determine if works made by an employee were within the scope of employment).

The Court finds that NLP has created a genuine issue of material fact as to whether Dzeng, Xiong, and McGinnis were employees of NLP at the time they wrote the scripts. First, it is beyond dispute that an individual can be the employee of more than one entity at the same time. *See* Restatement (Second) of Agency § 226 (1958); *Reid*, 490 U.S. at 751-52. Second, it is beyond dispute that an individual can be an employee without a formal, written employment agreement. *See* 11 Williston on Contracts § 32:5 (4th ed.). Therefore, the law permits an individual to be an employee of two entities even though it only has a formal employment agreement with one. And there is a genuine issue of material fact as to whether that was the case here.

Defendants point to the fact that the only written employment agreement is with CMS, *see* Motion at 16, but as the case law cited above establishes, this is not dispositive. NLP points to enough evidence in the record supporting a finding that Dzeng, Xiong, and McGinnis were also employed by NLP at the time they were employed by CMS. The clearest evidence is, of course, the testimony in their declarations, *see* Zhao Decl. ¶¶17, 24, 31; Bhagat Decl., ¶¶ 8, 19, 27; Xiong Decl., ¶¶ 6, 10, 17; Dzeng Decl., ¶ 4, but there is other evidence in the depositions that creates a genuine issue of fact—even if the Court disregards the declarations.

When asked if Dzeng wrote the Underlying Scripts for NLP, Zhao, who works for NLP and CMS, said that Dzeng was an employee of NLP but also said that when Dzeng wrote the Underlying Scripts, her contract was with CMS, and Dzeng did not have any employment contract with NLP. *See* Zhao Dep. 20:6-15, 26:12-27:5 (noting that Zhao works for NLP but does not have a formal employment contract), 101:13-102:1. Dzeng joined in June 2022, when NLP became its own entity. *See* Dzeng Dep. 33:7-12; Zhao Dep. 162:24-163:2; Ex. E at 0001722. Zhao also said that Dzeng "does work for NLP, so it's all implied that all the work belongs to NLP." *Id.* 111:19-23. Furthermore, Dzeng said that when she started working at both CMS and NLP, she had only one employment contract but that she did not remember if her employment contract was with NLP. *See* Dzeng Dep.14:2-3, 22:21-23:13. Dzeng then said her employment agreement with NLP was the

11

contract that stated the "related companies" language. *See id.* 36:25-37:11. And Dzeng said she first did work at CMS when she joined and then switched to NLP, where she wrote the two Underlying Scripts in the role of narrative designer. *See id.* 25:22-26:4, 40:20-41:2.

In regards to Xiong, Zhao said Xiong worked for NLP when she wrote the four Underlying Scripts but that her employment agreement was with CMS and she never had any employment agreement with NLP. *See* Zhao Dep. 112:15-113:7. Furthermore, Xiong said she was employed by NLP and had an employment contract with NLP, but when she first started as project manager from 2019-2022, she was employed by CMS. *See* Xiong Dep. 13:25-14:6, 18:10-15, 19:6-11, 32:14-20. And Xiong was promoted to head of content for NLP, where she wrote the Underlying Scripts, *see id.* 19:9-11, 52:20-53:1, but Xiong was not sure what she signed when she got promoted, *see id.* 21:19-23. And like Dzeng, Zhao said she worked for NLP, "so it's all directly work for hire IP for New Leaf," *id.* 121:14-18.[4]

Lastly, in regards to McGinnis, Zhao said that McGinnis was working for NLP when she worked on the one Underlying Script, and that she was employed by CMS and had an employment agreement with CMS with no written agreement with NLP. *See* Zhao Dep. 122:3-18, 128:3-13. Therefore, when taking the evidence in the light most favorable to NLP, a reasonable jury could find that Dzeng, Xiong, and McGinnis were employees of NLP at the time they wrote and edited the Underlying Scripts.

      ii. <u>A reasonable jury could also find that Dzeng, Xiong, and McGinnis—as employees—wrote the Underlying Scripts within the scope of their employment for NLP.</u>

Having found that there is a genuine issue of material fact with respect to whether Dzeng, Xiong, and McGinnis were employed by NLP at the time they wrote the Underlying Scripts, the

---

[4] At the Motion hearing, Defendants Counsel cited to UF ¶¶ 15, 16, 21, 22 to argue Dzeng and Xiong did not have any employment agreement with NLP, but the deposition questions in UF ¶¶ 15, 21, 22 regarding "an employment contract," "any employment contract," and "any other agreements" is not the same as directly asking if there were any formal or informal employment agreements with NLP, and an average person would think "any employment contract" or "any other agreement" means only a formal written agreement. Also, UF ¶ 16 refers to any agreement transferring intellectual property rights, which is not a question about an employment agreement. Thus, UF ¶¶ 15, 16, 21, 22 do not show there is no genuine dispute of material fact as to whether Dzeng and Xiong were employees of NLP vs CMS.

1   Court then turns to whether there is a genuine issue of material fact as to whether the scripts were
2   "works for hire" for NLP.
3        To be a work for hire *for NLP*, the Underlying Scripts must have been prepared within the
4   scope of their employment *for NLP*. To determine when a work is made by an employee "within the
5   scope" of employment, the Court again applies common law of agency principles and looks to
6   whether "(a) it is of the kind [the employee] is employed to perform; (b) it occurs substantially
7   within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to
8   serve the [employer]." *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1015 (9th
9   Cir. 2012); *see also JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125 (9th Cir. 2010). Examining these
10  factors, the Court finds that NLP has created a genuine issue of material fact as to whether Dzeng's
11  and Xiong's work on the Underlying Scripts was within the scope of their employment by NLP.
12  Motion at 20.
13       First, there is evidence that the script writing was of the kind of work Dzeng and Xiong were
14  employed to perform for NLP. Defendants contend that Dzeng's and Xiong's employment
15  agreements show that Dzeng and Xiong were working within the scope of employment for CMS, not
16  NLP, because their employment agreements anticipate making "works of authorship" with and for
17  CMS since the agreements state that "all Inventions are the *sole property of the Company*, and that
18  all tangible expressions of the Inventions … are the *sole and exclusive property of the Company* and
19  constitute work made for hire." *See* UF ¶ 33 (emphasis added); *see also* UF ¶ 34 (defining inventions
20  as "works of authorship"). And the employment agreements define the term "Company" solely as
21  "CRAZY MAPLE STUDIO, INC." *See* UF ¶ 35; Ex. E at 0001722; Ex. F at 0001738. Defendants
22  also contend that while Dzeng, Xiong, and McGinnis were working on the Underlying Scripts, their
23  salaries and employee benefits were paid for by CMS, which is in favor of them all working within
24  the scope of employment for CMS. *See* UF ¶ 31
25       However, NLP contends that both Dzeng and Xiong wrote and edited the Underlying Scripts
26  for the Films at Issue for NLP within the scope of their employment for NLP. *See* Zhao Decl. ¶¶ 18
27  25; *see also* Bhagat Decl. ¶¶ 9, 20; Xiong Decl. ¶¶ 7, 11; Dzeng Decl. ¶ 5 (same). Xiong said that
28  her job as head of content was to write scripts, where her managers, who work for both NLP and

CMS, told her what kind of scripts they needed, and she was just "tak[ing] a wild guess" of what to do. *See* UF ¶ 52; Zhao Dep. 20:6-15, 26:12-27:5; Xiong Dep. 23:8-17; 36:3-12. While Dzeng said her job was to write screenplays for NLP, and a lot of the work was "just nonofficial, like, creative process." Dzeng Dep. 15:4-14, 21:13-25. Zhao said Dzeng "does work for NLP, so it's all implied that all the work belongs to NLP." Zhao Dep. 111:19-23. And Dzeng said she did work at CMS when she joined and then switched to NLP, where she wrote the two Underlying Scripts in the role of narrative designer. *See* Dzeng Dep. 25:22-26:4, 40:20-41:2. While Xiong said when she wrote the Underlying Scripts, she was working in the role of head of content for NLP. *See* Xiong Dep. 19:9-11, 52:20-53:1. And like Dzeng, Zhao said NLP never had any written agreement with Xiong commissioning any works, *see* Zhao Dep. 120:24-121:13, but that was not necessary because she worked for NLP, "so it's all directly work for hire IP for New Leaf," *id.* 121:14-18. Therefore, when viewing these facts regarding Dzeng's and Xiong's employment with NLP—including their declaration testimony on this—in the light most favorable to NLP, and keeping in mind the descriptions and free-flowing creative nature of their roles, a reasonable jury could find that script writing was of the kind of work Dzeng and Xiong were employed by NLP to perform.

Second, NLP creates a genuine issue of material fact that Dzeng and Xiong wrote the Underlying Scripts "substantially within the authorized time and space limits, i.e., at the office from 9:30 a.m. to 5:30 p.m." Motion at 20. Defendants do not contest that Dzeng and Xiong wrote the Underlying Scripts within NLP's authorized time and space, because they argued Dzeng and Xiong were never working within the scope of employment for NLP. However, as discussed above, a reasonable jury could find that Dzeng and Xiong worked within the scope of employment for NLP. And NLP contends that Dzeng and Xiong were working within NLP's authorized time and space limits, because it is undisputed that NLP had business hours from 9:30 AM to 5:30 PM, *see* UF ¶ 78, and Dzeng and Xiong both work from the Sunnyvale office "pretty much every day" from 9 to 5:30 pm, *see* Dzeng Dep. 44:9-24; Xiong Dep. 41:17-20. And there is a dispute as to who owns the office, because Zhao said that he "thinks" the NLP office is owned by CMS, not NLP, *see* Zhao Dep. 105:15-106:4, and that it is shared with NLP, where people who work for both CMS and NLP go to

work, *see id.* 106:5-16. Accordingly, a reasonable jury could find that Dzeng and Xiong wrote the Underlying Scripts within NLP's authorized time and space.

Third, NLP creates a genuine issue of material fact as to whether Dzeng and Xiong's script writing was actuated by a purpose to serve NLP for their filmmaking. Defendants do not contest this third element because they argue there was never a purpose to serve NLP since Dzeng and Xiong were working within the scope of employment for CMS. *See* Motion at 30. However, if NLP is deemed to be doing the type of work an NLP employee is employed to do, and as explained above, there is a question of fact as to that, then Dzeng's and Xiong's script writing would be actuated by a purpose to serve NLP. Furthermore, Zhao said that the Underlying Scripts were written by Xiong and Dzeng for the purpose of filming by NLP. *See id.* 219:16-222; *see also* Zhao Decl. ¶¶ 18 25; *see also* Bhagat Decl. ¶¶ 9, 20; Xiong Decl. ¶¶ 7, 11; Dzeng Decl. ¶ 5 (same). Thus, a reasonable jury could find that Dzeng's and Xiong's script writing was actuated by a purpose to serve NLP—namely so NLP could produce films from the Underlying Scripts.

The Court acknowledges that Defendants have pointed to evidence which, if believed, would support a contrary finding. But the Court's task is not to weigh the credibility of competing evidence, but simply to determine whether the non-moving party has created genuine issues of material fact. NLP has. For this reason, the Court need not consider the other facts pointed to by Defendants—such as who paid the benefits and the source of instrumentalities and tools—because none are dispositive nor do they eliminate any genuine issue of material fact.

\*\*\*

The Court therefore finds that there is a genuine issue of material fact as to whether Dzeng, Xiong, and McGinnis were employed *by NLP* when they wrote the Underlying Scripts, whether they wrote the Scripts within the scope of their *NLP employment*—as opposed to their CMS employment—, and therefore whether the Underlying Scripts were works for hire *for NLP*. Accordingly, taking all the evidence described above in a light most favorable to NLP, there are genuine disputes of material fact preventing the Court from granting summary judgment in

Defendants' favor on whether the Underlying Scripts were written within the scope of employment for NLP.[5]

Because the Court finds that there is a genuine issue of material fact as to whether the Underlying Scripts were works for hire for NLP—in which case NLP validly holds the relevant copyrights—the Court need not reach the other grounds on which NLP also claims to hold the copyrights.

## VI. Conclusion

For the foregoing reasons, the Court hereby ORDERS as follows:

1. Defendants' Motion for Summary Judgment is DENIED as to NLP's First Cause of Action for Copyright Infringement; and
2. All pretrial and trial deadlines remain as previously set.

IT IS SO ORDERED.

Dated: October 21, 2025

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

---

[5] As explained above, there is no consensus that "NLP employs Ms. Dzeng and Ms. Xiong," that "Ms. Dzeng and Ms. Xiong wrote and edited the Underlying Scripts while employed by NLP," that "Ms. Dzeng and Ms. Xiong wrote and edited the Underlying Scripts for NLP within the scope of their employment for NLP, under the supervision and control of an NLP employee, for filming by NLP, and that "NLP owns the copyrights to the Underlying Scripts and that they were works-for-hire for NLP." *See* Motion at 19. These issues are all genuine disputes of material fact.

16